490 A.2d 701

## BALTIMORE LUTHERAN HIGH SCHOOL ASSOCIATION, INC.

v.

## EMPLOYMENT SECURITY ADMINISTRATION.

No. 111, Sept. Term, 1984.

Court of Appeals of Maryland.

April 10, 1985.

**650**

652

Paul J. Redmond, Towson, for appellant.

Amy S. Scherr, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, on the brief), for appellee.

Argued before MURPHY, C.J., SMITH, ELDRIDGE, COLE and RODOWSKY, JJ., CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), Specially Assigned, and ALAN M. WILNER, Associate Judge of the Court of Special Appeals, Specially Assigned.

CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), Specially Assigned.

This case began almost eight years ago, prompted by the amendment of the Maryland Unemployment Insurance Law to conform to the Federal Unemployment Tax Act. *See* Acts 1977, Ch. 919.[1] *Compare* Maryland Code (1957, 1979 Repl.Vol.) Art. 95A, § 20(g)(7)(v)B and C and 26 U.S.Code § 3309(b)(1)(A) and (B) and (2) (1982). Subparagraphs B and C of § 20(g)(7)(v) of the Maryland Law as amended designate two of the types of employment which are not included in the Law:

> B. Service by an individual in the employ of ... an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches;

> C. Service by a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry or by a member of a religious order in the exercise of duties required by that order.

Baltimore Lutheran High School Association, Inc. (Lutheran) is composed of Lutheran Churches, each of which is

---

1. The State Law was amended to conform to the Federal Law to fulfill all the conditions for federal certification of the State Law. Federal certification assured that Maryland employers would be eligible for a substantial tax credit and that the State would receive federal funding for its Employment Security Administration.

a member of the Missouri Synod. Lutheran, separately incorporated, operates the Baltimore Lutheran High School (the School). Lutheran thought that the School was "operated primarily for religious purposes" and in November 1977 sought a ruling from the Employment Security Administration[2] to that effect so that persons who performed services for the School would be exempt from the provisions of the Maryland Unemployment Insurance Law. Lutheran was partially successful in its effort. The Executive Director of the Employment Security Administration determined that those persons meeting the qualifications of subparagraph C who performed services for the School were exempt from unemployment insurance coverage.[3] But the Executive Director also determined that those persons who performed services for the School, other than those qualified under subparagraph C, were subject to unemployment coverage as not exempt under subparagraph B. He instructed the Division of Unemployment Insurance to take action accordingly. Lutheran was aggrieved by the latter determination. It took the issue to the Board of Appeals (Board I). The Board, however, reached the same determination as had the Executive Director. Lutheran looked to the Superior Court of Baltimore City; that court affirmed the Board. Lutheran was not assuaged. It noted an appeal to the Court of Special Appeals.[4] We issued a

---

**2.** When this proceeding was instituted the Unemployment Insurance Law was administered by the Employment Security Administration, a part of the Department of Human Resources. Acts 1983, Ch. 64 placed the administration of the Law under the Department of Employment and Training. Md. Code (1957, 1979 Repl.Vol., 1984 Cum. Supp.) Art. 95A, § 11(a) and (b). The caption of the case *sub judice* has not been amended to reflect this change.

**3.** This conclusion was also reached and affirmed during the review proceedings leading to the appeal we now consider. As it is not challenged, it is not before us. We do not address it further.

**4.** The appeal to the Superior Court of Baltimore City involved schools in addition to the Baltimore Lutheran High School. Board I, at the same time it made its determination that Lutheran was not entitled to an exemption, held that certain Jewish day and Sunday schools and

writ of certiorari before decision by that court and reported our decision in *Employ. Sec. v. Balto. Lutheran H.S.*, 291 Md. 750, 436 A.2d 481 (1981) *(Lutheran H.S. I )*. We remanded the case to the Board of Appeals (Board II)[5] without affirmance or reversal.

Our decision in *Lutheran H.S. I* was rendered in the light of *St. Martin Evangelical Lutheran Church v. South Dakota*, 451 U.S. 772, 101 S.Ct. 2142, 68 L.Ed.2d 612 (1981). *St. Martin* concerned the unemployment tax status under § 3309(b) of the Federal Act and under the complementary South Dakota statute. of those schools which had no legal identity separate from a church, 451 U.S. at 782–83 n. 12, 101 S.Ct. at 2148–49 n. 12. We recognized that *St. Martin* is not dispositive of the claim here because Lutheran is separately incorporated and operates the School. *Lutheran H.S. I,* 291 Md. at 756, 436 A.2d 481. It was clear under *St. Martin,* however, that in order for Lutheran to establish an exemption, it must, as a separately incorporated organization,

> satisfy the requirements of § 3309(b)(1)(B) [of the Federal Act and § 20(g)(7)(v)B of the complementary Maryland Law]: (1) that the organization "is operated primarily for religious purposes," and (2) that it is "operated, supervised, controlled or principally supported by a church or convention or association of churches." 451 U.S. at 782–783 n. 12, 101 S.Ct. at 2148–49 n. 12.

---

certain Catholic parochial and private schools were entitled to an exemption. The Superior Court affirmed the decision of Board I, resulting in appeals to the Court of Special Appeals by the Employment Security Administration and by Lutheran. Only Lutheran's case is before us on this appeal.

**5.** The members of Board I and the members of Board II were not the same. The same Appeal Counsel, however, represented both Boards.

We note that Board II also concluded that the School was supervised and controlled by a church or convention or association of churches. Thus, the School met the second requirement of § 3309(b)(1)(B) of the Federal Act and § 20(g)(7)(v)B of the Maryland Law. This holding is not challenged.

Therefore, the initial question before us was the first requirement of the statutes—whether Lutheran operates the School primarily for religious purposes.[6] *Lutheran H.S. I,* 291 Md. at 757, 436 A.2d 481.

*St. Martin* did not articulate the factors to be taken into account in determining whether a school run by an independently incorporated organization was operated primarily for religious purposes. We found in *Lutheran H.S. I,* however, that in applying standards in other contexts, the Supreme Court has identified appropriate factors. *Id.* at 757, 436 A.2d 481. We reviewed the relevant decisions of the Court, *id.* at 757–761, 436 A.2d 481, and set out those factors that appropriately may be taken into account, *id.* at 761, 436 A.2d 481. We applied them to the operation of the School. We set out in detail, as disclosed by the record, the composition of Lutheran, the supervision of the School and its funding, the purpose of the Association, the composition of the student body and the faculty of the School, the standards and the requirements of its educational process, and the part religion plays therein. *Id.* at 761–765, 436 A.2d 481. We observed:

> There was much evidence intended to show that religious indoctrination permeates the educational process within Lutheran High. However, there was no evidence to show the nature of the mandatory chapel services. There was no evidence to show whether the religion courses taught at the school were devoted to deepening religious experiences in the particular faith rather than teaching a range of human religious experiences as an academic discipline. In addition, while there was testimony that religion is taught in every nontheological course, and that each faculty member is trained to teach all subjects from a Christian viewpoint according to the doctrine enunciated by the Synod, no details were provided as to the impact of religion on the instructional meth-

---

**6.** With respect to the second requirement of the statutes *see* note 5 *supra.*

ods employed and the substantive content presented. More particularly, no teacher presented any evidence to show how teaching a nontheological course from a Christian viewpoint and according to the standards established by the Synod, differed from teaching such a course according to the academic requirements of the subject matter and the standards established by the State Department of Education. Finally, there was no evidence to show whether the school subscribes to and follows the principles of academic freedom. *Id.* at 765, 436 A.2d 481.

We declared:

> [I]n order to determine whether a school is operated primarily for educational rather than religious purposes, it is necessary to consider whether courses are taught in "an 'atmosphere of intellectual freedom' ... 'without religious pressures,'" *Roemer [v. Board of Public Works of Maryland]*, 426 U.S. [736,] 756, 96 S.Ct. [2337, 2349, 49 L.Ed.2d 179 (1976)]], and according to the principles of academic freedom. In the absence of evidence to show the substantive content of both theological and nontheological courses, and the instructional methods employed in these courses, there is no basis upon which to make this determination. *Id.* at 766, 436 A.2d 481.

We concluded, "Manifestly, in reaching its conclusion, the Board did not take all of the appropriate factors into account." *Id.* Although to that point, Lutheran had failed to prove its claim that the School was operated primarily for religious purposes, we believed that, in the circumstances, the purposes of justice would be advanced by permitting further proceedings. We therefore remanded the case to the Board of Appeals without affirmance or reversal, giving Lutheran the opportunity to fill the gaps in the evidence we had noticed and affording the Board the opportunity to reassess Lutheran's claim by applying, in the light of the entire record, the standard and the appropriate factors we had set forth. *Id.*

Board II conducted a plenary hearing as directed. Whereupon it held:

Services performed for Baltimore Lutheran High School by persons who are not ministers of religious education are engaged in covered employment within the meaning of § 20(g)(7)(v)B of the Maryland Unemployment Insurance Law and 26 U.S.C. Section 3309(b)(1)(B).

Board II expressly affirmed the determinations of the Executive Director and of Board I. Lutheran appealed to the Circuit Court for Baltimore County. That court affirmed Board II. Lutheran appealed to the Court of Special Appeals and again we granted certiorari before decision by the intermediate court.

The key to the appeal now being considered is whether the School is operated primarily for religious purposes.[7] Three separate and distinct administrative bodies have answered this question in the negative. Their decisions have been affirmed by two circuit courts. We must decide initially, within the limits of our authority, whether the decision shall stand.

It is apparent from the decisions of Board II and the Circuit Court of Baltimore County that neither of them believed that Lutheran had adequately met its burden of filling the evidentiary gaps.[8] In reaching its decision,

---

**7.** Lutheran presents this question in its petition for a writ of certiorari:

> Whether the Circuit Court was correct in upholding the decision by the Board of Appeals that services rendered by all employees of the Baltimore Lutheran High School Association, Inc. who are not installed ministers, are not exempt from coverage by Article 95A, Section 20(g)(7)(v)(B), Maryland Annotated Code, as amended, since the Baltimore Lutheran High School is not operated primarily for religious purposes.

**8.** Lutheran set forth in its petition for a writ of certiorari that the purpose of the further proceedings directed by *Employ. Sec. v. Balto. Lutheran H.S.*, 291 Md. 750, 436 A.2d 481 (1981) was to obtain evidence covering three areas: (1) the presence of academic freedom; (2) the substantive content of both theological and nontheological courses; and (3) the instructional methods used.

The appellee-respondent sees the mandate of this Court as providing the opportunity for evidence to be adduced "(1) regarding the nature of mandatory chapel services; (2) on whether courses taught were

Board II adopted, with two exceptions, the findings of fact made by Board I as set out in *Lutheran H.S. I* at 761–765, 436 A.2d 481.[9] The Board made additional factual findings which were supported by the evidence adduced before it. Board II then applied all the factual findings to the appropriate factors set out in *Lutheran H.S. I.*[10] Board II concluded that the School was not operated primarily for religious purposes. "The primary purpose of Lutheran High School," it decided, "is to operate a secondary school and impart a secondary education to its students."

At the hearing before Board II on remand the only witness produced by Lutheran was Allan Schmidt, the Principal of the School. We are in accord with the comments of the judge of the Circuit Court for Baltimore County regarding his testimony.

> A thorough reading of the record in the second hearing indicates that the Board attempted to "consider whether the courses are taught 'in an atmosphere of intellectual freedom' ... 'without religious pressures' (citation omitted) and according to the principle of academic freedom." [citing to *Lutheran H.S. I*] at 766 [436 A.2d 481]. However, the Board's efforts were frustrated when the only testimony introduced was that offered by Mr. Schmidt.

'devoted to deepening religious experiences in a particular faith rather than teaching a range of human religions as an academic discipline;' (3) on details as to the impact of religion on instructional methods and substantive content of courses; (4) on the degree of academic freedom; and (5) from teachers as to the difference in instructional methods of teaching non-theological courses from a Christian viewpoint than according to the academic standards of the subject matter."

**9.** Board II noted that the tuition range of the School at the time of its decision was $1,050 to $1,900 and that the daily classes consisted of seven 45 minute courses, one of which was specifically designated as a religious class.

 It seems that Lutheran does not challenge the adopted factual findings as amended.

**10.** The factual findings and their application by Board II are set out verbatim in Appendix A of this opinion.

The principal was vague and conclusory as to whether the secular courses were taught "according to the principles of academic freedom." *Id.* at 766 [436 A.2d 481]. When asked to give examples of how the secular classes were taught, Mr. Schmidt stated that in many instances when a teacher noticed that a student was having trouble academically, personally or was a disciplinary problem, the Bible would often be used to give guidance. The principal also relies on the presence of the Lutheran teachers in the classroom to impose religious pressure on students.

The judge deemed the statements of Schmidt to be "insufficient to show the Board that classes were not taught in an atmosphere of intellectual freedom"; in other words, Schmidt did not show that intellectual or academic freedom was overwhelmed by religious pressure. The judge noted this Court's suggestion that the Board consider testimony from teachers of secular subjects, but Lutheran did not offer such testimony for the consideration of the Board. In short, the judge opined, although "[t]he Board considered what little new evidence was brought before it in the second hearing," Lutheran did not meet its burden of producing evidence legally sufficient to show that the School was operated primarily for religious purposes. He affirmed the decision of Board II.

■■■ The scope of review of a final decision of an administrative agency is the same in substance whether the agency is under the Administrative Procedure Act or excluded from it under Md.Code (1984) § 10–202 of the State Government Article. Judicial review of the actions of agencies which are included in the Administrative Procedure Act is as prescribed by SG § 10–215.[11] For the most part, the scope of judicial review of the decisions of agencies which are excluded from the Administrative Procedure Act is

---

11. According to the Revisor's Note "[t]his section is new language derived without substantive change from former Art. 41, § 255" of Md. Code (1957, 1982 Repl.Vol.).

separately set out in various statutes.[12] Thus, the judicial review of decisions of the administrative body of concern here, the Board of Appeals of the Department of Employment and Training, excluded from the Administrative Procedure Act, SG § 10–202(a)(3)(iii), appears in Art. 95A, § 7(h). It provides, in relevant part:

> Any party aggrieved by a decision of the Board of Appeals may secure judicial review thereof by appeal to the circuit court of the county.... In any judicial proceeding under this section, the findings of the Board of Appeals as to the facts, if supported by competent, material and substantial evidence in view of the entire record, and in the absence of fraud,[13] shall be conclusive, and the jurisdiction of said court shall be confined to questions of law.... An appeal may be taken from the decision of the circuit court of the county to the Court of Special Appeals in the same manner, but not inconsistent with the provisions of this article, as is provided in civil cases.

The substantiality of the evidence is the common denominator of the scope of judicial review with respect to all administrative agencies. Hammond, C.J., speaking for a majority of this Court in *Insurance Comm'r v. Nat'l Bureau*, 248 Md. 292, 236 A.2d 282 (1967), summed it up in this way:

> Whichever of the recognized tests the court uses—substantiality of the evidence on the record as a whole, clearly erroneous, fairly debatable or against the weight or preponderance of the evidence on the entire record—its appraisal or evaluation must be of the agency's fact-finding results and not an independent original estimate of or decision on the evidence. The required process is difficult

---

12. *See,* for example, the following articles and sections of the Md. Code: Art. 48A, § 40 (Insurance Commissioner); Art. 78, § 97 (Public Service Commission); Art. 81, § 229(*o*) (Maryland Tax Court); Art. 101, § 56 (Workmen's Compensation Commission).

13. There is no allegation of fraud in the case before us.

to precisely articulate but it is plain that it requires restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions under any of the tests, all of which are similar. There are differences but they are slight and under any of the standards the judicial review essentially should be limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. This need not and must not be either judicial fact-finding or a substitution of judicial judgment for agency judgment. *Id.* at 309–310, 236 A.2d 282.

That is to say, a reviewing court, be it a circuit court or an appellate court, shall apply the substantial evidence test to the final decisions of an administrative agency, but it must not itself make independent findings of fact or substitute its judgment for that of the agency. Of course, a reviewing court may always determine whether the administrative agency made an error of law. Therefore, ordinarily, the court reviewing a final decision of an administrative agency shall determine (1) the legality of the decision and (2) whether there was substantial evidence from the record as a whole to support the decision.

 In *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 390 A.2d 1119 (1978), Eldridge, J., speaking for the Court and citing and quoting from cases within and without the State, treatises and law journals, discussed the meaning and application of "substantial evidence." He observed that "substantial evidence" has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. The scope of review is limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. In applying the substantial evidence test, the reviewing court should not substitute its judgment for the *expertise* of those persons who constitute the administrative agency from which the appeal is taken. The reviewing court also must review the agency's decision in the light most favorable to the agency, since decisions of administrative agencies are prima facie

correct and carry with them the presumption of validity. Furthermore, not only is it the province of the agency to resolve conflicting evidence, but where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences. *Id.* at 512–513, 390 A.2d 1119. We affirmed the views expressed in *Nat'l Bureau* and *Bulluck* in *P. G. Doctor's Hosp. v. HSCR Comm'n*, 302 Md. 193, 200–202, 486 A.2d 744 (1985) and even more recently in *Johns Hopkins Hospital v. Ins. Comm'r*, 302 Md. 411, 418, 488 A.2d 942 (1985).

Lutheran has apparently overlooked the limited scope of judicial review of administrative agencies for it does not argue in terms of the function of the reviewing court. It posits that the testimony of Schmidt was "clear and convincing," but obviously the Board did not find the testimony clear enough or convincing enough to establish to its satisfaction that the School was operated primarily for religious purposes. Lutheran sets out six reasons which it claims will prove that the School was so operated. These reasons, however, are actually factual findings now suggested by Lutheran, but the Board did not make these findings. It seems that Lutheran would have us act as a trier of fact. This we may not do.

Lutheran argues that Board II ignored certain testimony presented to it, but the record reflects otherwise. Contrary to Lutheran's contention, the record shows that the Board considered the mandatory chapel services, the Lutheran philosophy of education, the use of the Bible in the classroom and the effect of the teachers' Christian beliefs in the methodology of education and on classroom content. This evidence, however, did not persuade Board II that the School's primary purpose was religious.

On our review of the entire record, we believe that a reasoning mind reasonably could have reached the conclusion that the School was not operated primarily for religious purposes. Therefore, since a reviewing court may not substitute its judgment for that of the Board, and since

the court must review the Board's decision in the light most favorable to the Board (the Board's decision is prima facie correct and carries the presumption of validity), the decision of Board II must be left undisturbed. Furthermore, even if conflicting inferences could be drawn from the factual findings made by Board II in the exercise of its function as the trier of fact, that is, it could be inferred that the School was or was not primarily religious, it is for the Board to draw the inference, not the reviewing court. We have followed this principle in the past, *see, e.g., Comptroller v. Haskin*, 298 Md. 681, 472 A.2d 70 (1984), and we shall continue to do so.

In reaching its decision, Board II followed the standard and applied the factors we set out in *Lutheran H.S. I.* Therefore, it made no error of law. We hold that the Circuit Court for Baltimore County did not err, absent a constitutional impediment, in affirming the decision of Board II.

Lutheran presented a conditional question in its petition for a writ of certiorari. If we held that the Circuit Court for Baltimore County was correct in upholding the decision of Board II that employees of the School were not exempt from unemployment insurance coverage, then Lutheran would have us consider whether § 20(g)(7)(v)B of the Maryland Unemployment Insurance Law was constitutionally valid as applied to Lutheran.[14] Inasmuch as we have affirmed the decision of Board II, the conditional question has surfaced.

We did not reach the constitutional issue in *Lutheran H.S. I. See* 291 Md. at 754 n. 2, 436 A.2d 481. Board II

---

**14.** Lutheran's question on this issue, as presented in its petition for certiorari, was

whether the court's construction of [Art. 95A, § 20(g)(7)(v)B], subjecting [the School] to coverage, violates the free exercise and establishment clauses of the Maryland and Federal Constitutions?

In Lutheran's brief, however, the question is argued only in terms of the federal constitution. We shall restrict our discussion accordingly. Md.Rule 846 f.

only impliedly indicated that the laws were constitutional by finding that they did not result in excessive governmental entanglement with religion. The Circuit Court for Baltimore County made an express holding that Maryland's Unemployment Insurance Law was constitutionally valid as applied to Lutheran. The constitutional provision involved is the First-Fourteenth Amendment's declaration that no law shall be made "respecting an establishment of religion, or prohibiting the free exercise thereof; ...." *See Murdock v. Pennsylvania,* 319 U.S. 105, 108, 63 S.Ct. 870, 872, 87 L.Ed. 1292 (1943); *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

We need look only to *United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) to resolve Lutheran's constitutional claim with respect to the free exercise of religion. *Lee* was primarily concerned with social security taxes but there is such an affinity between those taxes and unemployment insurance taxes as to make *Lee* dispositive. The court noted in *Lee:*

> The Social Security Act and its subsequent amendments provide a system of old-age and unemployment benefits. 26 U.S.C. § 3101 *et seq.* (1976 ed. and Supp. III). These benefits are supported by various taxes, including, relevant to this appeal, the Federal Insurance Contributions Act (FICA) and the Federal Unemployment Tax Act (FUTA) taxes. The FICA tax is a tax paid in part by employees through withholding, 26 U.S.C. § 3101 (1976 ed., Supp. III), and in part by employers through an excise tax. 26 U.S.C. § 3111 (1976 ed., Supp. III). The FUTA tax is an excise tax imposed on employers. 26 U.S.C. § 3301. Both taxes are based on the wages paid to employees, and the recordkeeping and transmittal of funds are obligations of the employer. Only the FICA tax is collected from self-employed individuals. *Id.* at 254 n. 1, 102 S.Ct. at 1053 n. 1.

Lee was a member of the Old Order Amish and he hired other Amish to work on his farm and in his carpentry shop. He failed to file the quarterly social security tax returns

required of employers, withhold social security taxes from his employees, or pay the employer's share of social security taxes. The Internal Revenue Service assessed him for unpaid employment taxes. He paid a small amount and sued in the United States District Court for the Western District of Pennsylvania for a refund, claiming that imposition of social security taxes violated his First Amendment free exercise rights and those of his Amish employees. The District Court held that the statutes requiring *Lee* to pay social security and unemployment insurance taxes were unconstitutional as applied. The Supreme Court thought otherwise and reversed the judgment of the District Court. *Id.* at 254–256, 102 S.Ct. at 1053–1055.

In holding that Lee was not entitled to an exemption, the Supreme Court recognized the Amish belief "that there is a religiously based obligation to provide for their fellow members the kind of assistance contemplated by the social security system." *Id.* at 257, 102 S.Ct. at 1055. The Court accepted Lee's "contention that both payment and receipt of social security benefits is forbidden by the Amish faith. Because the payment of taxes or receipt of benefits violates Amish religious beliefs, compulsory participation in the social security system interferes with their free exercise rights." *Id.* But that did not end the inquiry. The Court noted, "Not all burdens on religion are unconstitutional." *Id.* It declared, "The state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest." *Id.* at 257–258, 102 S.Ct. at 1055. The Court described the social security system and concluded that "the Government's interest in assuring mandatory and continuous participation in and contribution to the social security system is very high." *Id.* at 258–259, 102 S.Ct. at 1056. It further found that accommodating the Amish belief would "unduly interfere with fulfillment of the governmental interest." *Id.* at 259, 102 S.Ct. at 1056. It said: "To maintain an organized society that guarantees religious freedom to a great variety of faiths requires that some religious practices yield to the

common good. Religious beliefs can be accommodated, but there is a point at which accommodation would 'radically restrict the operating latitude of the legislature.'" *Id.* at 259, 102 S.Ct. at 1056; quoting *Braunfeld v. Brown,* 366 U.S. 599, 606, 81 S.Ct. 1144, 1147, 6 L.Ed.2d 563 (1961) (other citations omitted).

Lutheran's position is far weaker than was that of Lee. In *Lee,* as we have seen, the Court took off from the premise that compulsory participation in the social security system interfered with the free exercise rights of the Amish. Lutheran, however, does not make such a claim. There is no suggestion that compulsory participation in the unemployment insurance scheme would, in itself, conflict with the tenets of Lutheran's faith. Nor does Lutheran allege that there is a religiously based obligation for members of the Lutheran faith to provide for their fellow members the kind of assistance contemplated by the unemployment insurance laws. Nevertheless Lutheran urges that the refusal to grant it an exemption would unconstitutionally burden its exercise of religion in that it would interfere with the management of the School. Lack of an exemption would adversely affect Lutheran's desire to employ teachers "who satisfactorily communicate the doctrine of the Synod" and would limit its ability "to assign [the School's] employees to activities in furtherance of their religious mission." It would also impose "an administrative and tax cost burden on the operation of an integral part of the religious mission of the association and its member churches." Even if these allegations do burden Lutheran, we do not believe that they amount to an interference with the practice of a legitimate religious belief not justifiable by the compelling governmental interest demonstrated by the Unemployment Insurance Law. *See Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner,* 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963). The interest of the State is clearly set out in the Legislature's Declaration of Policy in § 2 of the Law:

As a guide to the interpretation and application of this article, the public policy of this State is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this State. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our economic life. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declared that in its considered judgment the public good, and the general welfare of the citizens of this State require the enactment of this measure, under the police powers of the State, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

It is clear that this very high State interest is sufficient to override the alleged limitations on Lutheran's religious liberty.

It is also readily apparent that granting the exemption Lutheran seeks would unduly interfere with fulfillment of the State's interest. The reasons the Court advanced in *Lee* for its conclusion that accommodating the Amish belief would unduly interfere with fulfillment of the governmental interest in the social security act are equally applicable here. We summarize the Court's comments in *Lee*, 455 U.S. at 259–260, 102 S.Ct. at 1056–1057, substituting "unemployment insurance" for "social security."

In *Braunfeld v. Brown*, 366 U.S. 599, 605 [81 S.Ct. 1144, 1146, 6 L.Ed.2d 563] (1961), this Court noted that

"to make accommodation between the religious action and an exercise of state authority is a particularly delicate task ... because resolution in favor of the State results in the choice to the individual of either abandoning his religious principle or facing ... prosecution." The difficulty in attempting to accommodate religious beliefs in the area of taxation is that "we are a cosmopolitan nation made up of people of almost every conceivable religious preference." *Braunfeld, supra,* at 606 [81 S.Ct. at 1147]. The Court has long recognized that balance must be struck between the values of the comprehensive [unemployment insurance system], ... and the consequences of allowing religiously based exemptions. To maintain an organized society that guarantees religious freedom to a great variety of faiths requires that some religious practices yield to the common good. Religious beliefs can be accommodated, ... but there is a point at which accommodation would "radically restrict the operating latitude of the legislature." *Braunfeld, supra,* at 606 [81 S.Ct. at 1147].

[I]t would be difficult to accommodate the comprehensive [unemployment insurance] system with myriad exceptions flowing from a wide variety of religious beliefs. The obligation to pay the [unemployment insurance] tax initially is not fundamentally different from the obligation to pay income taxes; the difference—in theory at least—is that the [unemployment insurance] tax revenues are segregated for use only in furtherance of the statutory program. There is no principled way, however, for purposes of this case, to distinguish between general taxes and those imposed under the [Unemployment Insurance Law]. If for example, a religious adherent believes war is a sin, and if a certain percentage of the federal budget can be identified as devoted to war-related activities, such individuals would have a similarly valid claim to be exempt from paying that percentage of the income tax. The tax system could not function if denominations were allowed to challenge the tax system because tax

payments were spent in a manner that violates their religious belief.

The Court concluded, "Because the broad public interest in maintaining a sound tax system is of such a high order, religious belief in conflict with the payment of taxes affords no basis for resisting the tax." *Lee*, 455 U.S. at 260, 102 S.Ct. at 1056.

We note that the State has accommodated, to the extent compatible with a comprehensive State program, the practices of those who believe it would interfere with the free exercise of their religion to participate in the unemployment insurance system. This is apparent from the exemptions granted by § 20(g)(7)(v)A and B of Art. 95A.

Lutheran also invokes the First Amendment prohibition against a "law respecting an establishment of religion...." For a statute to prevail when scrutinized under the establishment clause it must (1) have a secular purpose; (2) neither advance nor inhibit religion; (3) not foster an excessive entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612–613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). *See Mueller v. Allen*, 463 U.S. 388, ——, 103 S.Ct. 3062, 3066, 77 L.Ed.2d 721 (1983); *Hunt v. McNair*, 413 U.S. 734, 741, 93 S.Ct. 2868, 2873, 37 L.Ed.2d 923 (1973). The secular purpose of the Unemployment Insurance Law is apparent—to provide for those who are unemployed through no fault of their own. The Law in no wise is respecting an establishment of religion, nor does it advance or inhibit religion. Lutheran's contention centers on the third prong of the test. It urges that the Law as applied to it fosters an excessive entanglement with religion. This is so because, Lutheran alleges, the Law places on it financial burdens and clerical burdens and burdens in maintaining its doctrinal standards. In answering this contention, we find *Salem College & Academy, Inc. v. Emp. Div.*, 298 Or. 471, 695 P.2d 25 (1985) to be most persuasive. Salem College and Academy, Inc., founded in Oregon, is an interdenominational Christian primary and secondary school organized as

a nonprofit corporation, exempt from federal income taxes. It claimed, as does Lutheran here, that it was exempt from the obligatory coverage of the State's counterpart to the federal unemployment insurance act. The Supreme Court of the State of Oregon reversed the decision of the Oregon Court of Appeals that Salem was exempt. We adapt the comments of the Supreme Court of Oregon to the case before us, and largely adopt its reasons in reaching our decision.[15]

As to financial burdens, the unemployment insurance taxes are "in no way based on activities or resources that are more characteristic of schools than of other kinds of employers or institutions, let alone on a school's religious character or the content of its programs." *Salem,* 298 Or. at 486, 695 P.2d 25. On the contrary,

> [t]he obligation to provide unemployment coverage focuses solely on the economic and social aspect of the employment relation and the cost that unemployment imposes on the discharged employee and on society.[16] *Id.*

In actuality, the unemployment insurance taxes "are financial burdens only in the same sense that the costs of employing paid workers at all are financial burdens; a religious association engaged in the free exercise of workships or other religious activity without employing paid personnel pays no unemployment tax." *Id.* at 487, 695 P.2d 25. *See* Art. 95A, § 20(g)(7)(v)C.

The alleged administrative and clerical burdens such as posting notices, filing reports and keeping payroll records

---

**15.** *Salem College Academy, Inc. v. Emp. Div.,* 298 Or. 471, 695 P.2d 25 (1985), although speaking primarily in terms of the Oregon Constitution, noted that its reasons also met the Academy's Claim for exemption under the First Amendment. *Id.* at 487 n. 12, 625 P.2d 25.

**16.** The tax burden is not completely inescapable. The Unemployment Insurance Law allows a nonprofit organization instead of paying the taxes to reimburse the state unemployment compensation fund in amounts equal to the actual unemployment benefits attributed to a claimant's service for the employer. Md.Code, Art. 95A, § 8(d)(2).

subject to State inspection are also "tailored to the economic aspect of the employment relation and not to any activities peculiarly characteristic either of schools or of religious programs. They are no different in principle from a host of other secular regulatory requirements such as health inspections of cafeteria workers or kitchens, safety inspections of school buses, and licensing of drivers." 298 Or. at 487, 695 P.2d 25.

Lutheran alleges that, under the Unemployment Insurance Law, it will be unable to maintain the doctrinal standards required of its employees. It will be unable to discharge an employee for failing to meet those standards without opening its doctrines and faith to State scrutiny in protracted and expensive contests over unemployment benefits and administrative determinations that will entangle the State in religion. We answer this in the words of *Salem*, "This eventuality can adequately be dealt with if and when it happens; we have no reason to believe that discharges of school employees over matters of religious doctrine are so frequent as to require the employer's entire exemption from the unemployment compensation system on that account." *Id.* In the case before us, Lutheran showed no reason to believe to the contrary.

Lutheran presents only one question in its brief and that question goes to whether the School was operated primarily for religious purposes. It addresses this in argument I. Argument II invokes the religious freedom guarantees of the First Amendment. This argument is not in response to a question presented in the brief, *see* Md. Rule 831 c 2, but does cover question 2 in Lutheran's petition for a writ of certiorari. We have answered that argument. The brief also contains an argument III which is not in response to either a question in the petition or a question in the brief. Argument III is headed:

The court by differentiating "between separately incorporated" and "not separately incorporated schools," creates

a classification which unconstitutionally differentiates between two christian schools simply because of their form of worship.

We do not know to what "court" Lutheran refers. *St. Martin, supra,* as we have seen, made such a distinction, and we recognized the *St. Martin* holding in *Lutheran H.S. I, supra,* but neither of these cases are even cited in Lutheran's brief. Lutheran does not specify the constitutional provision which it baldly states the differentiation violates. Nor does it make clear, if the differentiation is constitutionally repugnant, why it should be afforded relief.

■ It may be that Lutheran believes that the *St. Martin* distinction brings into play equal protection of the laws or substantive due process. The State so construes Lutheran's argument. If so, the point was never raised and decided below and we need not address it. Md. Rule 885. In any event the only two cases Lutheran cites in support of its position, whatever it may be, are of no help. *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) is quoted by Lutheran, without page reference, as simply stating that "freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law.... The Religion Clauses safeguard the free exercise of the chosen form of worship." This homily does nothing to advance Lutheran's cause. Lutheran also looks to *Patch Enterprises, Inc. v. McCall,* 447 F.Supp. 1075 (M.D.Fla.1978). It declares that the *Patch* court said that "any form of state legislation creating discriminatory classifications that concerns fundamental constitutional rights, or whose defining criteria are inherently suspect, or that are unnecessarily restrictive and unreasonably related to the legislation's purported purpose, is subject to challenge and examination as a denial of equal protection of the law." *Patch* also said:

In enacting socio-economic, general welfare legislation, states and their subdivisions have a wide latitude of

discretion to select implementing classifications.... The overall requirement of the Equal Protection Clause, however, is that the statutory line that draws distinctions and classifications is a rational one, bearing "some rational relationship to a legitimate state purpose." *Id.* at 1079–1080.

It is apparent from Art. 95A, § 2 that the Unemployment Insurance Law has a legitimate state purpose. Within that statute the distinction between a school which has no identity beyond that of a church, and a school which has a separate legal existence serves the legitimate state purpose of assuring that the Unemployment Insurance Law will be uniformly administered and that the taxes will be paid by those organizations with a separate legal existence from a church unless that organization was operated primarily for religious purposes. Even if Lutheran's third argument were properly before us and construed in a manner most favorable to Lutheran, it has no merit. There is a rational basis for the challenged differentiation in any event and equal protection of the laws is not denied thereby.

The bottom line is:

When followers of a particular sect enter into a commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity. *United States v. Lee*, 455 U.S. at 261, 102 S.Ct. at 1057.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.

### APPENDIX A

The expression by Board II of the application of the facts adopted and found by it to the appropriate factors is as follows:

Regarding the nature of the mandatory chapel services, the Board finds that these are worship services which are held once a week and are required of all students. Regarding the nature of the religious courses taught, the Board finds as a fact that these courses are devoted to deepening the student's Christian faith from the viewpoint of the Lutheran Church. These courses are not designed as academic and dispassionate studies of various religious doctrines. They are taught by two teachers specifically recruited for religious instruction who specialize in this area and are not even accredited as teachers by the Maryland State Department of Education.

The Board finds as a fact that there is little or no religious impact on the content of the non-theological courses taught. Although the philosophy of education of the school (and that of the principal of the school), is that the Bible is the primary textbook used in all classes, the Petitioner [(Lutheran)] was unable to demonstrate any concrete way in which the text of the Bible had an impact upon the content of any non-theological course.

The Board has carefully considered whether the fact that the school principal states that evolution is not taught at the school shows a biblical impact upon a non-theological course. The Board concludes, however, that it does not. The testimony on this aspect of the case was that, while the school does not "teach" evolution, it does impart to the students the knowledge of what the theory of evolution consists. The Board is unable to discern any difference, at the high school level, between teaching a scientific theory as a theory and letting the students know of what the theory consists. The other factor cited by the Petitioner, purportedly to show that there is no such thing as a non-theological course, is that each course is taught from or by a Christian teacher. For reasons which will be elaborated on below, the Board does not perceive that the fact that the teacher is a Christian has that great an effect on the substantive content of the courses taught.

The Board also discerns no significant religious impact on the instructional methods used in a non-theological courses. Beyond the bald statement that all methodology is subservient to Lutheran Christian doctrine, the testimony concerning the methods was extremely vague. The Board finds two factors significant in coming to the conclusion, as it does, that there is no significant religious impact on the content of the non-theological courses. First, the only specific religious components of the non-theological courses noted were that these courses may be interrupted for prayer for someone who may have a relative who is sick and that the classes may be interrupted for the teacher to read a portion of the Bible to a student who is having difficulties. The significant fact in both of these areas is that both of these activities consist of *interruptions*. The Board will not find a significant impact on the substantive content of a non-theological high school course based on interruptions which may occur during the classes.

Second, the Petitioner's primary contention in regard to the non-theological courses is that the mere presence of Lutheran Christian teachers has an intangible effect on the students. The Petitioner states that their biggest task is to stay away from the interference with the workings of the Holy Spirit between the teachers and students. The Board is not doubting the sincerity of the Petitioner's witness, nor the efficacy of this method at all, but the Board is unwilling to adjudicate a case under the tax laws of Maryland based on a difference in instructional methods which is wholly intangible. The Board notes that, were the mere presence of a Christian teacher sufficient to make a non-theological course into a theological course, any public school employing a Christian teacher would be promoting the establishment of religion in violation of the First Amendment. Surely, some more concrete effect on methodology must be proven in order to show that a particular class is religiously oriented.