572 A.2d 1126

**Gabe MIRKIN, et al.**

v.

**MEDICAL MUTUAL LIABILITY INSURANCE
SOCIETY OF MARYLAND.**

**No. 1093, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

May 3, 1990.

Edward Greensfelder, Jr., Washington, D.C. (Gertrude C. Bartel and Kramon & Graham, P.A., Baltimore, and Julie A. Thompson, Washington, D.C., on the brief), for appellant, Mirkin.

Bryan D. Bolton (David M. Funk and Shapiro and Olander, on the brief), Baltimore, for appellee.

Argued before ALPERT, KARWACKI and FISCHER, JJ.

KARWACKI, Judge.

Gabe Mirkin, M.D., appeals from an order of the Circuit Court for Baltimore City which reversed a determination by the Insurance Commissioner that Medical Mutual Liability Insurance Society of Maryland (Medical Mutual) violated

Md.Code Ann., Art. 48A, § 234A [1] when it attempted to cancel appellant's professional liability insurance. This litigation arose under the following circumstances.

On March 4, 1982, 24 year old Tom Bennington, Jr., accompanied by his father, went to see Dr. Mirkin to have a wart removed from his thumb. Dr. Mirkin examined Bennington's thumb as well as a black lesion on his left leg. Dr. Mirkin told Bennington that the lesion looked cancerous and recommended that a biopsy be performed to determine whether it was malignant. Dr. Mirkin's secretary anesthetized the area for a biopsy excision. Because this was Bennington's first visit to Dr. Mirkin, the physician's secretary also filled out a billing record for Bennington and wrote on it "Exc nevus left leg 11 mm, multicolored changing" denoting the excision of the lesion 11 millimeters in length from Bennington's left leg. She also noted "Exc wart right thumb" on the billing record, describing the excision of the wart. The wart was removed, but before Dr. Mirkin removed the lesion, Bennington's father told Dr. Mirkin that they did not have insurance to cover medical expenses. In response, Dr. Mirkin said that he was so certain the lesion was cancerous that the biopsy was not really necessary and that he could remove the lesion and a section of tissue around it in his office at that time. This would eventually have to be done, he explained, and it saved Bennington the expense of the biopsy. The Benningtons agreed with this suggestion and the lesion and a section of tissue around it were removed. A copy of the billing record, which was the only record made of Bennington's visit to Dr. Mirkin's office, was given to Bennington. It was not changed, however, to reflect the procedure that was actually performed.

Following the procedure, Dr. Mirkin had the lesion and tissue specimen sent to Cytopathological Associates for a pathological examination. The Tissue Examination Report

---

1. Hereinafter, all statutory references will be to Article 48A ("Insurance Code"), unless otherwise noted.

confirmed that the lesion was cancerous and contained a description of the specimen as "a single pinkish tan tissue with a dark brown pigmented center, measuring 20 × 10 [millimeters.]" A copy of the report was given to Bennington by Dr. Mirkin on a follow up visit.

In August of 1982, Bennington began to experience swelling in his left groin area, and he consulted Dr. Jeremy Cooke. Dr. Cooke diagnosed Bennington as having disseminating cancer. He informed Dr. Mirkin of this and told him that he was now treating Bennington. Dr. Cooke made a notation in his records that the scar on Bennington's leg as a result of Dr. Mirkin's excision was five centimeters in length. Dr. Cooke also referred Bennington to a surgeon, Dr. Kreupz, who later surgically removed a lymph node from Bennington's groin which was also found to be malignant.

In September of 1982, Bennington saw Dr. Max Cohen, a surgical oncologist. Dr. Mirkin, at Bennington's request, sent Dr. Cohen a copy of the Tissue Examination Report prepared by Cytopathological Associates. On September 23, 1982, Dr. Cohen performed a resection of the original excision on Bennington's left leg and removed a lymph node. It was not cancerous. At about this time, Dr. Cohen contacted Dr. Mirkin and expressed his opinion that the excision on Bennington's left leg seemed to be much larger than 20 by ten millimeters as stated on the Tissue Examination Report.

On April 4, 1983, Dr. Mirkin wrote to Cytopathological Associates, informing them that the specimen that he submitted to them for testing was much larger than 20 by 10 millimeters as stated in its Tissue Examination Report. "The specimen was huge ... I am sure that the total amount of skin was 18 centimeters by about 7 cm," Dr. Mirkin wrote. Four days later, Dr. William Lee, a pathologist with Cytopathological Associates, sent Dr. Cohen an amended pathology report, which, the report noted, was "made with the aid of Dr. Gabe Mirkin's operative description." It stated that the "[e]ntire specimen measure[d] 18

cm × 7 cm × 7–9 mm in thickness. There is a deeply pigmented slightly elevated lesion in the center measuring 20 mm × 10 mm in size." Dr. Mirkin then called Dr. Sanford Barsky at Cytopathological Associates and discussed the amended report. Shortly thereafter, a second amended report was sent to Dr. Cohen by Dr. Barsky which attempted to explain the discrepancy between the original and amended reports. This report, which also described the specimen sent to them by Dr. Mirkin as 18 by seven centimeters, explained that the 20 × 10 millimeter specimen referred to in the original Tissue Examination Report was the section used for testing that was cut out of the 18 by seven centimeter section submitted to the lab by Dr. Mirkin. This report also stated that the lesion itself measured five by four millimeters.

On December 8, 1983, Mirkin was contacted by Bennington's lawyer who requested copies of Bennington's medical records and bills. On January 9, 1984, Dr. Mirkin sent him a letter enclosing what he termed "my operative notes and the pathology report." What was actually sent were copies of the second amended Tissue Examination Report completed by Dr. Barsky and a billing record describing Bennington's visit to Dr. Mirkin. The billing record enclosed, however, was not the one prepared at the time of Bennington's visit that described the excision of an 11 millimeter lesion from the patient's left leg. Rather, the billing record forwarded to Bennington's attorney was prepared by Dr. Mirkin after receiving the letter requesting Bennington's medical records, and it described the excision as 18 by seven centimeters, and recommended that the patient see another doctor for follow up treatment for the cancer. This record, although handwritten by Dr. Mirkin sometime between December 8 and December 19, 1983, was dated March 4, 1982, the date that Mirkin performed the excisions on Bennington's thumb and left leg. In addition, Dr. Mirkin also sent a letter to the claims department of his insurer, Medical Mutual, along with a copy of the letter from Bennington's attorney, the second amended Tissue Examination Report

and a billing record. This billing record, however, was different from both the original and the one forwarded to Bennington's attorney. The billing record sent to Bennington's attorney indicated that Dr. Mirkin spoke to Bennington about getting follow up care on March 11, 1982 and the billing record sent to Medical Mutual stated that this conversation took place on March 4, 1982. Furthermore, Dr. Mirkin did not mention to either Bennington's attorney or to Medical Mutual the existence of the original billing record. He also later testified that at the time that he prepared the second and third billing records he "had an idea" that Bennington might file a malpractice claim against him. To summarize, the correspondence that Dr. Mirkin sent to Medical Mutual and Bennington's attorney did not mention the existence of the original billing record, nor did it mention the fact that the billing record that was forwarded was not prepared at the time Bennington was treated by Dr. Mirkin but was drafted some 21 months later and was backdated to the time of the treatment.

On May 23, 1984, Bennington filed a claim against Dr. Mirkin with the Health Claims Arbitration Office alleging that Dr. Mirkin was negligent in failing "to properly excise the malignant melanoma with sufficient margins to prevent recurrence" and in failing "to schedule follow-up examination after the excision for the purpose of early detection and treatment of any recurrence." In August of 1985, Dr. Mirkin's deposition was taken and the existence of the original billing record, a copy of which was given to Bennington at the time of his treatment, was made known to Medical Mutual. Shortly thereafter, Medical Mutual's claims agent, Kathleen Killeavy, discussed the matter of the different billing records with Dr. Mirkin, who was notified by Medical Mutual claims manager Richard L. Donniez on December 2, 1985 that "the possibility exists that there may have been additions or alterations made by you to your office notes and bills. If these alterations or additions should prove to be prejudicial and material, we reserve the

right to withdraw coverage and the defense of this civil action against you."

On January 21, 1987, after a hearing, the Health Claims Arbitration Panel determined that Dr. Mirkin was liable to Bennington for negligence in the amount of $650,000. During the course of that hearing, Dr. Mirkin testified that none of the three billing records were accurate. Kevin McCarthy, Esq., the attorney retained by Medical Mutual to represent Dr. Mirkin, reported to Killeavy that the chairman of the panel that heard the case told him, off the record, that the panel's decision was based on Dr. Mirkin's improper follow up and that "[n]o member of the panel believed that Dr. Mirkin was credible as a witness."

On September 21, 1987 Medical Mutual notified Dr. Mirkin that his insurance would be cancelled as of October 17, 1987, for "alteration of records." On October 2, 1987, Dr. Mirkin filed a complaint with the Insurance Commissioner alleging that Medical Mutual had violated § 234A(a) of the Insurance Code,[2] which proscribes, *inter alia,* the cancellation of insurance for any arbitrary or capricious reason or for a reason other than one that involves "the application of standards which are reasonably related to the insurer's

---

2. § 234A(a) reads as follows:
**§ 234A. Unfairness or discrimination in underwriting.**
 (a) No insurer, agent or broker shall cancel or refuse to underwrite or renew a particular insurance risk or class of risk for any reason based in whole or in part upon race, color, creed, sex, or blindness of an applicant or policyholder or for any arbitrary, capricious, or unfairly discriminatory reason. In the case of a cancellation of or refusal to renew a policy, provided the insured requests of the Commissioner that a review be undertaken of the insurer's action prior to the effective date of termination of the policy, and provided the Commissioner initiates action toward issuance of a finding in accord with § 235C, such policy shall remain in effect until such finding is issued. No insurer, agent or broker may cancel or refuse to underwrite or renew a particular insurance risk or class of risk except by the application of standards which are reasonably related to the insurer's economic and business purposes. At any hearing to determine whether there has been a violation of this section, the burden of persuasion shall be upon the insurer to demonstrate that the cancellation, or refusal to underwrite or renew is justified under the standards so demonstrated.

economic and business purposes." A hearing on this complaint was held before the Insurance Commissioner on April 22, 1988 and continued on May 18, 1988 and August 16, 1988. At this hearing, Medical Mutual stated that the underwriting standard it applied in cancelling Dr. Mirkin's insurance was as follows:

> Professional liability insurance will not be provided to any physician who, in connection with a prior claim, materially altered medical records after becoming aware of the possibility of a claim arising from an act or omission in the furnishing of professional services. Alteration includes any addition, correction or change to or written supplementation of the patient's medical records occurring after the creation of those records unless the subsequent addition, correction, change or supplementation is clearly labeled to indicate that it is not a contemporaneous record.

The Insurance Commissioner concluded that this standard satisfied § 234A, but had been improperly applied because there was

> no evidence that Mirkin, or any of his personnel, in any way altered Bennington's records. The additional report presented by Mirkin was more complete than the billing record maintained by his office. The billing record represents the only record maintained by Mirkin of medical care and treatment given to Bennington and was in no way altered. Therefore [Medical Mutual] has not proved that Mirkin violated the underwriting standard which was applied in this case.

Consequently, Medical Mutual was ordered to continue to insure Dr. Mirkin.

On March 1, 1989, Medical Mutual appealed this order to the Circuit Court for Baltimore City. The court (Hammerman, J.) reversed, holding that there was not substantial evidence presented at the hearing from which the Insurance Commissioner could reasonably have concluded that Dr. Mirkin did not alter his medical records. The court also ruled that the standard applied by Medical Mutual complied

with § 234A since it is related to its economic and business purposes and ordered the Insurance Commissioner to dismiss Dr. Mirkin's complaint.

Dr. Mirkin presents two issues for our review. The first is whether the circuit court erred in reversing the decision of the Insurance Commissioner based on a lack of substantial evidence. The second is whether the circuit court erred in ruling that Medical Mutual's standard is "reasonably related to [its] economic and business purposes." We shall answer both questions in the negative and affirm the decision of the circuit court.

## I.

The basic standard for judicial review of an administrative finding of the Insurance Commissioner is whether the finding is supported by substantial evidence. § 40; *Lumbermen's Mut. Cas. Co. v. Insurance Comm'r.*, 302 Md. 248, 266, 487 A.2d 271 (1985). This means "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Id.* This standard of review "is narrow in scope and the decision of the administrative agency carries a presumption of validity." *Doctor's Hosp. v. Maryland Health Resources*, 65 Md.App. 656, 667, 501 A.2d 1324 (1986). In applying this test, a reviewing court should not substitute its judgment for that of the agency from which the appeal is taken. *Bulluck v. Pelham Wood Apartments*, 283 Md. 505, 513, 390 A.2d 1119 (1978). Of course, a reviewing court may always determine whether an administrative agency made an error of law. *Baltimore Lutheran High School v. Employment Sec. Admin.*, 302 Md. 649, 662, 490 A.2d 701 (1985).

A careful review of the evidence on the issue of whether Dr. Mirkin altered his medical records supports Judge Hammerman's conclusion that there was no substantial evidence to support the Insurance Commissioner's decision. The only contemporaneous record of Dr. Mirkin's treatment of Bennington was the one prepared at the time

of the surgery, which, due to an oversight by Dr. Mirkin, was not accurate. But when asked to provide Bennington's attorney and Medical Mutual with his records of Bennington's treatment, he did not send them that record. Instead, he created new, more thorough "records," backdated them to make it appear as though they were prepared at the time of the treatment and transmitted them without indicating that he was withholding the original record. Furthermore, these "records" were created at a time when Dr. Mirkin "had an idea" that Bennington was planning to sue him for malpractice, and they were different from the original record in two important, self-serving ways. First, the second set of records described the excision as much larger than the original record did; also, the second set of records contained a recommendation that Bennington seek follow up care, which was not included in the original record. Significantly, whether a large enough excision was made to prevent the recurrence of cancer and whether Dr. Mirkin informed Bennington of the need for follow up care were issues in the malpractice suit subsequently filed against Dr. Mirkin.

Dr. Mirkin contends that the second set of medical records were not alterations because the original record was in no way modified and because the second set gave a more complete account of the medical procedure performed. While this may be true, the original record was concealed and a record made 21 months later was backdated, thereby misrepresenting it as the original record. If the second set of records was intended merely to supplement the original with a more detailed account of the procedure performed, there would have been no reason to conceal the original record and backdate the supplemental one. Although the circuit court and this Court are constrained by a narrow scope of review, it is nonetheless incumbent upon us to "examine all inferences and factual conclusions drawn by the agency to make sure that they reasonably follow from facts. We must also examine all facts found by an agency to insure that there was evidence to support them." *Doc-*

*tor's Hosp. v. Maryland Health Resources,* 65 Md.App. 656, 667, 501 A.2d 1324 (1986). We find no evidence to support the Insurance Commissioner's factual finding that Dr. Mirkin did not materially alter his records after becoming aware of the possibility of a claim arising from an act or omission in his furnishing of professional services to Bennington.

## II.

 Dr. Mirkin also argues that the standard employed by Medical Mutual in cancelling his insurance policy violates § 234A because it is not "reasonably related to the insurer's economic and business purposes." We disagree. Medical Mutual has provided in its brief the following explanation for its adoption of this standard:

> Credible, accurate, contemporaneous medical records are the foundation of the proper defense of a medical malpractice claim. Even if contemporaneous records are not complete, credible testimony of a treating physician may be used to supplement the records and demonstrate compliance with the applicable standard of care. If a physician submits subsequently prepared medical records which are represented as contemporaneous, however, the credibility of the contemporaneous records as well as of the physician will be destroyed.

We find this standard to be reasonably related to Medical Mutual's economic and business purposes. Medical Mutual is denying coverage to those physicians whose medical records cannot be relied on when defending a claim against them. The reasonableness of this is brought into even sharper focus by the $650,000 award assessed by the Health Claims Arbitration Panel in Bennington's favor against Dr. Mirkin. Indeed, Dr. Mirkin admitted at the hearing before the panel that none of his billing records were accurate, and it is not surprising that he was not considered to be a credible witness by the panel.

Dr. Mirkin asserts that appellee's justification for the standard is not sufficient; that in order to comply with

§ 234A an insurer must present statistical evidence which satisfies the three part test employed in *Crumlish v. Ins. Comm'r*, 70 Md.App. 182, 190, 520 A.2d 738 (1987) [3]. In employing this three part test the *Crumlish* court, as the Court of Appeals noted in *Muhl v. Magan*, 313 Md. 462, 475–76, 545 A.2d 1321 (1988), "presupposed that the statute could be satisfied only by an objectively demonstrable, statistical basis for underwriting." There are, however, circumstances in which this is not possible. *See, e.g., Miller v. Ins. Comm'r*, 70 Md.App. 355, 521 A.2d 761 (1987) (An underwriting standard providing for the cancellation of a policy obtained by a material misrepresentation was held to be reasonably related to the insurer's economic and business purposes without statistical proof.). There are obviously some underwriting standards whose fairness cannot be demonstrated through statistics but are nonetheless "reasonably related to the insurer's economic and business purposes." The standards employed in this case and in *Miller, supra,* provide useful examples. Each of these underwriting standards reflects the insurer's reluctance to insure what it justifiably considers questionable risks. The fact that the suitability of these standards cannot be mathematically verified does not foreclose their being "reasonably related to the insurer's economic and business purpose." We do not read § 234A as requiring insurers to utilize only those underwriting standards capable of statistical validation.

---

**3.** The Crumlish court in reviewing a determination by the Insurance Commissioner that an automobile liability insurer had not violated § 234A in attempting cancellation of a policy required the production of evidence which answered at least the following questions:

1. What is the statistical basis for the supposition that a person who has two or more chargeable losses within a 24 month period is more likely to have a chargeable accident within the next 12 months than a person who has had no accidents, one chargeable accident or two or more nonchargeable accidents?

2. How valid is any such statistical evidence?

3. If there is statistical validity to the supposition, what direct and substantial adverse effect would it have upon [the insurer's] losses and expenses in light of its current approved rating plan?

Crumlish, 70 Md.App. at 190, 520 A.2d 738.

552

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY THE APPELLANT.