880 A.2d 1137

H. Robert SCHERR

v.

HANDGUN PERMIT REVIEW BOARD.

No. 780, Sept. Term, 2004.

Court of Special Appeals of Maryland.

July 11, 2005.

Reconsideration Denied Sept. 8, 2005.

---

418

**420**

H. Robert Scherr, Glen Burnie, for Appellant

Mark H. Bowen (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

Panel: SALMON, BARBERA, WILLIAM W. WENNER, (Ret., Specially Assigned), JJ.

SALMON, Judge.

With certain exceptions, some of which will be discussed *infra*, section 4–203(a)(1) of the Criminal Law Article of the Annotated Code of Maryland (2002) makes it illegal for anyone to

(i) wear, carry, or transport a handgun, whether concealed or open, on or about the person; or

(ii) wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State.

One of the exceptions to the foregoing prohibition is set forth in section 4–203(b)(2) of the Criminal Law Article. That section allows

the wearing, carrying, or transporting of a handgun by a person to whom a permit to wear, carry, or transport the handgun has been issued under Article 27, § 36E of the Code.

MD.CODE ANN., CRIM. LAW § 4–203(b)(2) (2002).

Article 27, Section 36E,[1] of the Maryland Annotated Code (1996 Repl., 2000 Supp.), provides:

---

1. In 2003, Article 27, section 36E, of the Criminal Law Article was recodified as Section 5–306 of the Public Safety Article of the Annotated Code of Maryland (2003). Section 5–306 reads as follows:

**Qualifications for permit:**

(a) *In general.*—Subject to subsection (b) of this section, the Secretary shall issue a permit within a reasonable time to a person who the Secretary finds:

(1) is an adult;

(2)(i) has not been convicted of a felony or of a misdemeanor for which a sentence of imprisonment for more than 1 year has been imposed; or

(ii) if convicted of a crime described in item (i) of this item, has been pardoned or has been granted relief under 18 U.S.C. § 925(c);

(3) has not been convicted of a crime involving the possession, use, or distribution of a controlled dangerous substance;

(a) *Issuance.*—A permit to carry a handgun shall be issued within a reasonable time by the Secretary of the State Police, upon application under oath therefor, to any person whom the Secretary finds:

(1) Is eighteen years of age or older; and

(2) Has not been convicted of a felony or of a misdemeanor for which a sentence of imprisonment for more than one year has been imposed or, if convicted of such a crime, has been pardoned or has been granted relief pursuant to Title 18, § 925(c) of the United States Code; and

(3) If the person is less than 30 years of age and who has not been:

(i) Committed to any detention, training, or correctional institution for juveniles for longer than one year after an adjudication of delinquency by a juvenile court; or

(ii) Adjudicated delinquent by a juvenile court for:

1. A crime of violence;

------

(4) is not presently an alcoholic, addict, or habitual user of a controlled dangerous substance unless the habitual use of the controlled dangerous substance is under legitimate medical direction; and

(5) based on an investigation:

(i) has not exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another; and

(ii) has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger.

(b) *Applicant under age of 30 years.*—An applicant under the age of 30 years is qualified only if the Secretary finds that the applicant has not been:

(1) committed to a detention, training, or correctional institution for juveniles for longer than 1 year after an adjudication of delinquency by a juvenile court; or

(2) adjudicated delinquent by a juvenile court for:

(i) an act that would be a crime of violence if committed by an adult;

(ii) an act that would be a felony in this State if committed by an adult; or

(iii) an act that would be a misdemeanor in this State that carries a statutory penalty of more than 2 years if committed by an adult.

2. Any violation classified as a felony in this State; or

3. Any violation classified as a misdemeanor in this State that carries a statutory penalty of more than 2 years; and

(4) Has not been convicted of any offense involving the possession, use, or distribution of controlled dangerous substances; and is not presently an addict, an habitual user of any controlled dangerous substance not under legitimate medical direction, or an alcoholic; and

(5) Has, based on the results of investigation, not exhibited a propensity for violence or instability which may reasonably render his possession of a handgun a danger to himself or other law-abiding persons; and

(6) *Has, based on the results of investigation, good and substantial reason to wear, carry, or transport a handgun, provided however, that the phrase "good and substantial reason" as used herein shall be deemed to include a finding that such permit is necessary as a reasonable precaution against apprehended danger.*

(Emphasis added.)

On September 23, 2002, H. Robert Scherr, Esq., applied to the Maryland State Police, pursuant to Article 27, section 36E, for a permit to carry a handgun. The Secretary of the Maryland State Police denied the permit because, allegedly, Scherr had not shown, based on the results of the police investigation, "good and substantial reason to wear, carry, or transport a handgun." Scherr appealed that denial to the Handgun Permit Review Board ("the Review Board"). After a hearing, the Review Board affirmed the denial. Scherr then filed a petition for judicial review in the Circuit Court for Baltimore County. Judge Thomas Bollinger conducted a hearing at the conclusion of which he remanded the matter to the Review Board because (1) there was evidence in the record that Scherr was "a former prosecutor"; (2) neither the Review Board nor the state police official who made the determination to deny the permit considered the fact that Scherr was a former prosecutor; and (3) a former prosecutor,

due to "past adverse dealings with criminals," would "certainly have a level of apprehended danger more than the average person would encounter."

A second hearing was held before the Review Board on November 5, 2003. Eight days after the hearing, on November 13, the Review Board, in a three to two decision, once again affirmed the denial of the handgun permit by the Secretary. A second petition for judicial review was then filed by Scherr. In a written opinion and order dated May 26, 2004, Judge Christian M. Kahl affirmed the Review Board's decision to deny the permit.

Scherr filed a timely appeal in which he raises five questions, which we have reworded:

1. Was the conclusion of the Review Board that appellant has failed to demonstrate a good and substantial reason to wear, carry, or transport a handgun supported by substantial evidence?

2. Did the Review Board err in failing to find that appellant had "good and substantial reason to wear, carry, or transport a handgun"?

3. Do the provisions of Article 27, Section 36E(a)(6) violate the due process clause of the Fourteenth Amendment because those provisions do not bear a real and substantial relation to the public health, morals, safety, and welfare of the citizens of the State of Maryland?

4. Is Article 27, Section 36E(a)(6), unconstitutional because it violates the Second Amendment to the Constitution of the United States?

5. Does the Maryland Declaration of Rights provide a state constitutional right to bear arms?

## I.

### *EVIDENCE PRESENTED AT THE FIRST HEARING BEFORE THE REVIEW BOARD*

A state police background check of Scherr was conducted shortly after he applied for a handgun permit. The investiga-

tion revealed that Scherr was a law abiding citizen with an excellent reputation. He was a member of the National Guard between 1970 and 1976 and received an honorable discharge. Scherr, a lawyer, resides in Baltimore County.

As part of the investigation, Scherr was interviewed by Maryland State Police Trooper Richard Kelly. Scherr told Trooper Kelly that he was a divorce lawyer and wanted a gun permit due to the "nature of his work."

After the interview by Kelly, Scherr's application for a permit was reviewed by Detective Sergeant Anthony Galloway, a supervisor of the State Police Handgun Permit Unit. Detective Sergeant Galloway noted that Scherr's application contained "no evidence and/or reference" to previously having been subjected to either "assaults, threats, or robberies." As a result of Galloway's review, the state police sent Scherr a "shortage letter" asking him to provide them with evidence of prior assaults, robberies, and/or threats. The letter asked that the prior assaults, etc., be corroborated by police reports. On November 22, 2002, Scherr returned the "shortage letter" with the word "none" handwritten next to the block requesting evidence of assaults and/or threats supported by police reports; he also wrote the word "none" next to the block requesting evidence that he had been a robbery victim.

Detective Sergeant Galloway, on November 22, 2002, recommended that the handgun permit be denied because Scherr had produced no evidence: (1) showing that he was the recipient of threats and/or assaults as a result of his activities as a divorce lawyer; (2) showing that the applicant's "level of threat and/or danger" was any greater than that of an ordinary citizen; and (3) demonstrating a "good or substantial reason" why he should be allowed to "wear, carry, or transport a handgun."

At the hearing before the Review Board, Detective Sergeant Galloway was cross-examined extensively by Scherr, who acted as his own attorney, concerning the criteria that Galloway used to establish whether an applicant's level of threat and/or danger "was any greater than that of the

ordinary citizen." The cross-examination included the following exchange:

Q [MR. SCHERR] What is your criteria to determine whether a person has a good or substantial reason to carry a handgun?

A Whether or not that person's level of danger warrants the issuance of a Handgun Permit.

Q What is an acceptable level of danger, and what is not an acceptable level of danger?

A An acceptable level of danger is that which is more than the average person would expect to encounter. Unacceptable would be anything other than that. And we require that you have police reports to substantiate that, because often, people come to us and say that they've been involved in activities or have been threatened and assaulted, when it never occurred. And the only way for us to know that it actually did occur is whether or not there's been something to substantiate it, reports of witnesses, something, other than the person just coming to me and saying, you know, I was threatened, I was assaulted.

Q All right. So what you're testifying to is that an acceptable level of danger to you, which would merit your issuing a permit, would be, I think you said more than the average person would encounter?

A Yes.

Q What would the average person encounter, in your mind? I'm just trying to figure out what all your, what your standards are. You said that an acceptable level of danger to get a permit would be more than the average person would encounter. I'm asking you, what is the standard that an average person would encounter, so that I can determine what's more and what's less?

A There is no definitive standard. I look at that, and I interpret that as meaning more than someone saying, "I'm going to harm you," or someone bumping into you or someone making gestures, that we all encounter every day.

You're at the supermarket, and someone bumps into you and gives you the evil stare. We all encounter that from time to time. Someone cuts you off on the road. We all have encountered that. Verbal arguments between people. We all encounter that. We all have, and we all will. But there is no definitive standard, that I'm aware of. We have to use good judgment.

Q So your testimony, then, is that the definite—you have indicated that an acceptable level of danger to you, which would then—based on that, you would then issue a permit. That is more than what—you said, is more than an average person would encounter. That phrase is your own . . .

A Yes.

Q . . . thinking, right?

A Uh-huh.

Q In other words, for lack of a better word, you made that up?

A Yes.

Scherr testified that fifty percent of his cases as an attorney concerned divorce matters. Due to his domestic relations practice, he had at times "felt uncomfortable" based on "the demeanor of specific litigants." He explained that, although he had never been threatened by a litigant, he nevertheless wanted to carry a handgun "for protection." Scherr further explained:

I live near Baltimore City. I generally, at times, am in fear of danger to myself and my family. I drive into the city. I drive into the city at night at times, whether to go out socially or whatever. I go with my family; and at times, I feel unsafe. There is a lot of crime in the city. There's over 260 homicides a year, and I feel uneasy when I go out . . . *my main reason for asking for a handgun permit is because I feel that we live in a dangerous society. I feel there is a difference living near Baltimore City, as opposed to living on the Eastern Shore or in other areas of Maryland and I feel that as a law abiding citizen, I do, and the*

*fears that I do have in general, I think I'm entitled to carry a handgun.*

(Emphasis added.)

During the course of his testimony, Scherr twice mentioned that he was a "former prosecutor," but he did not say when he held that position, nor did he specify how his former occupation was relevant to his need to carry a handgun.

## II.

### THE BOARD'S INITIAL DECISION

On February 5, 2003, the Review Board issued its decision, which, in material part, read:

The Board finds no evidence or documentation or police reports in the record of threats or assaults against the applicant as a result of his activities as an attorney. The Board finds no evidence or documentation or police reports of any robberies, threats, assaults, or injuries to the applicant or his property during the course of his daily activities. There is no evidence in the record that the applicant's life is in danger or that the applicant is being targeted by individuals wishing to do him harm.

### Conclusions of Law

Based upon its findings of fact, the Board concludes, pursuant to Article 27, Section 36E(a)(6) of the Annotated Code of Maryland, that the applicant has not demonstrated a good and substantial reason to wear, carry or transport a handgun as a reasonable precaution against apprehended danger. The Board concludes that the applicant's vague apprehensions of danger and personal anxiety over the crime situation are not sufficient to support the issuance of a handgun permit. It is for the Board, not the individual concerned, to determine whether the facts involved constitute apprehended danger sufficient to carry a handgun. Utilizing the objective test enunciated in *Snowden v. Handgun Permit Review Board*, 45 Md.App. 464, 413 A.2d 295

(1980), the Board concludes that the degree of apprehended danger to which the applicant is exposed is not sufficient to warrant the issuance of a handgun permit.

## III.

### *EVIDENCE INTRODUCED AT THE SECOND HEARING BEFORE THE BOARD*

At the second hearing, Scherr called Detective Sergeant Galloway as an adverse witness. Galloway testified that he had, on behalf of the state police, made "hundreds" of decisions as to whether to issue handgun permits. These decisions had been made over a period of approximately three years. Detective Sergeant Galloway had, on approximately fifteen to twenty occasions, approved applications when there had been no prior police report of a threat against the applicant, but, except for former police officers, he had never approved an application where the applicant had failed to produce evidence of a threat. Scherr and Detective Sergeant Galloway next engaged in the following colloquy:

Q [MR. SCHERR] Have you ever granted permits to retired police officers who have not been threatened, who have not presented evidence of threats?

A Yes.

Q Why?

A Because while they're on the job, they're continually subjected to threats by people. And the date that they retire does not mean that someone who they may have arrested the week before or the day before would not seek some type of retaliation against them.

Q All right. But in granting the permit, you're indicating that these people have not come to you when they have applied for their permit, the retired police officer, and said I need a permit because Joe Blow who I arrested last week threatened me, correct?

A Yes.

Q What you're saying is you granted permits because the fact that their position was that they were a police officer and they had arrested people, that fact alone gives them a greater apprehension of danger because of the profession they held and the fact they did arrest a lot of people and that level of danger continues after they have retired, correct?

A Yes.

The chairman of the Review Board and Detective Sergeant Galloway then had this exchange:

Q [CHAIRMAN PRETL:] There is an issue of immediacy, is there not? In other words, you have denied permits to somebody who retired ten or fifteen or twenty years ago as a police officer—

A Certainly.

Q—because you felt that the immediacy of the risk was no longer there?

A Certainly.

Q So if there is a factor—I mean, if he retired and a week later came in for a permit, it would be different than if he came in fifteen years after he retired?

A Certainly.

Q So it's a question of degree, it's a question of your perception of whether there is still a danger there—

A Yes.

Q—given the lapse of time and the circumstances of their occupation—

A Yes.

Scherr testified that he had been a prosecutor in Baltimore City for approximately two and one-half years from 1975 through 1977. He was a member of a "felony trial team" and, in that capacity, prosecuted "murders, rapes, robberies, every kind of violent crime, burglaries, hundreds of them in two and a half years." The sentences meted out for the convictions he obtained "ranged from probation to life imprisonment and everything in between."

Scherr admitted on cross-examination that he could not recall receiving any threats as a result of his prosecutorial activities, nor had he subsequently met anyone he had previously prosecuted.

Upon questioning by the chairman, Scherr conceded that in neither his application for a handgun permit nor in his initial conversation with Trooper Kelly did he ever claim that he "had an apprehension or fear" brought about by his previous work as a prosecutor. Nevertheless, Scherr testified that, although he did not have a "strong fear" of retaliation by those he had prosecuted previously, the matter was "sometimes in the back of my mind" due to the fact that he had "put a lot of people in jail" who could now be "getting out."

As an additional reason for wanting a gun permit, Scherr testified:

> And the fact that I am in the public eye because I'm a talk show host, and I'm on radio in Baltimore—I'm also on radio nationwide at times and I talk about it. And people call me and it just comes up that I'm a former prosecutor. And it's always been in the back of my mind that people that could be getting out of jail hear me on the radio.
>
> It's one thing if I got lost in the crowd and, you know, people—you know, I wasn't a public figure. And it crosses my mind all the time. Does it keep me up at night? No. And is there any specific threat? No. But do I have a fear of it? Yes.

## IV.

The Review Board issued its second decision on November 13, 2003. The "Findings and Conclusions" of the Board's majority read:

> The Board did not find credible the applicant's testimony that he today has a reasonable apprehension of danger related to his two-year stint as a City prosecutor ending 26 years ago. The Board finds this alleged apprehension neither objectively nor subjectively sustainable.

On an objective level of proof, applicant conceded that he had no threats or even encounters with his criminal defendants from the 1970s, but merely was concerned that some of them might soon be discharged from prison, and seek him out, because of his "high profile." However, he conceded that he has not sought a permit during the intervening 26 years, when such fears presumably would be more immediate or real.

More importantly, on a subjective level, it is clear to the Board that his prior role as a prosecutor, and "apprehension" related to that role, was no genuine factor at all in Mr. Scherr's request for a permit. He failed to mention his prosecutorial role in the mid–70s—or any related concerns—when he filed his application with the MSP, nor did he bring this up when he was interviewed at length by Trooper Kelly of the MSP, nor when he testified before this Board in January, nor even when he filed his appeal from the prior ruling. His memorandum filed in [c]ircuit [c]ourt reiterates at some length the arguments above, including the constitutional arguments, but this document (which Scherr prepared as his own attorney) makes no reference at all to the stint he served as a prosecutor. In fact, Mr. Scherr conceded at the second hearing that the issue was actually raised for the first time at the July oral argument by Judge Bollinger himself, who had personal knowledge *dehors* the record of applicant's prosecutorial experience, from the judge's prior dealings with the applicant in court.

The Board concludes from the record taken as a whole that applicant's insistence that he lives in fear of criminal retaliation is merely a convenient, after-the-fact justification, in an effort to take advantage of a circumstance that clearly did not enter into his thinking or motivation when he originally applied for a permit. The Board is also compelled to accept the adverse testimony of D/Sgt. Galloway that the date and lack of "immediacy" of applicant's prior role— together with a lack of threats—would have been a strong negative factor in MSP's determination, as in similar cases, even had that delayed "apprehension" been suggested by

Mr. Scherr last year, when the application was originally filed and investigated. In short, the Board concludes that even with his additional evidence, applicant has still not shown a good and substantial reason for a permit, under the statute—now Section 5-306(5)(ii) of the Public Safety Article.

Finally, the Board cannot accept applicant's contention that Judge Bollinger intended in his August 28 ruling to order the Board to grant him a permit, irrespective of additional evidence. It would be illogical to conclude (and therefore the Court did not rule as a matter of law) that *any* "former prosecutor" has an "elevated level of apprehended danger" sufficient to meet the objective standard of *Snowden v. Handgun Permit Review Board, supra*—regardless of the location of the courts in which he served, the types of offenses prosecuted, or the lapse of time since the last case was prosecuted. Just as in the case of ex-police officers and prison guards, it is the statutory duty of the Superintendent to make an informed judgment, consistent with *Snowden,* whether the applicant's alleged apprehension of danger is reasonable, unreasonable or feigned.

## V. *ANALYSIS*

### A. ISSUE 1—THE SUBSTANTIAL EVIDENCE ISSUE

A decision that is not supported by substantial evidence is arbitrary and capricious and will not be affirmed. In deciding whether substantial evidence exists to support an administrative finding,

> the reviewing court should not substitute its judgment for the *expertise* of those persons who constitute the administrative agency from which the appeal is taken. The reviewing court also must review the agency's decision in the light most favorable to the agency, since decisions of administrative agencies are prima facie correct and carry with them the presumption of validity. Furthermore, not only is it the province of the agency to resolve conflicting evidence, but

where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences. *Baltimore Lutheran High School Ass'n, Inc. v. Employment Security Admin.,* 302 Md. 649, 662–63, 490 A.2d 701 (1985).

As stressed by the Review Board, in order to grant a permit to carry a handgun, the Secretary of the state police, or his/her designee, must find, *inter alia,* that the applicant has, based on the results of investigation, "good and substantial reason to wear, carry, or transport a handgun. . . ." *See* Article 27, Section 36E(a)(6).

A "good and substantial reason" includes, but is not limited to, situations that support "a finding that [the handgun] permit is necessary as a reasonable precaution against apprehended danger." *Id.*

In the subject case, the Review Board's bottom-line conclusion, enunciated after the second hearing, was that appellant had not demonstrated a "good and substantial reason" why he should be granted a permit to carry a handgun. Scherr contests that conclusion. He argues that he proved that a handgun permit was necessary as a reasonable precaution against danger he apprehended.

Scherr also maintains that the Review Board's decision was "arbitrary and capricious" and not based on substantial evidence because, allegedly, the decision was based "largely . . . upon the testimony of Detective Sergeant Galloway," who testified that he would issue a permit only if he thought the applicant faced a level of danger that was higher than the level "the average person would encounter." According to Scherr, because Detective Sergeant Galloway admitted he had made up this "danger encountered by an average person" standard, the entire gun permit application process was arbitrary and capricious.

Scherr's premise that the Review Board based its decision "in large part" on Detective Sergeant Galloway's standard is not supported by the record. The test the Review Board used was the one mandated by section 36E(a)(6), i.e., whether Scherr had shown that he had a "good and substantial reason

for obtaining a handgun permit." Under the statute, one can show a substantial reason for a permit without showing that a gun permit is needed as a reasonable precaution against apprehended danger. But Scherr's *sole* argument as to why he should be issued a permit was based on the (alleged) fact that he needed a gun permit as a reasonable precaution against apprehended danger.

In its second opinion, the Board addressed the issue of whether appellant needed a permit because of his former job. The Board found that no permit was needed because (1) it rejected Scherr's testimony that he presently has a "reasonable apprehension of danger related to his two-year stint as a [c]ity prosecutor," and (2) the apprehension of danger originating from his former job as a prosecutor was not reasonable, inasmuch as no threats from criminals he had prosecuted had *ever* been received by him. In the Board's view, Scherr's testimony that he feared criminal retaliation was "merely a convenient, after-the-fact justification" for a handgun permit, which in no way motivated his original application.

In its initial decision, which was rendered before appellant even mentioned his fear that criminals might retaliate against him because he was a former prosecutor, the Review Board characterized Scherr's "apprehension of danger and personal anxiety over the crime situation" in Baltimore City as "vague" and insufficient to support the issuance of a permit.

Taking, as we must, the decision of the Review Board as presumptively correct and valid, *Baltimore Lutheran High School Ass'n, Inc., supra,* 302 Md. at 662–63, 490 A.2d 701, we can find no fault in the Review Board's finding of fact or conclusion regarding appellant's testimony at the first hearing. Usually, a well-educated person, like appellant, who actually apprehends danger, can be expected to give a solid explanation as to why his apprehension is reasonable. But here, appellant's explanation as to why he apprehended danger was, as the Review Board noted, "ill-defined and vague," *viz:* (1) based on the demeanor of litigants he has encountered in his divorce practice, he felt "uncomfortable" in their presence,

even though he had never been threatened by those litigants; (2) he lives near Baltimore City, a place that has a lot of murders, and he feels unsafe when driving either alone or with his family through Baltimore; (3) he lives in a dangerous society. If fears of this sort justified issuance of a handgun permit, it is hard to see how the Review Board could deny any law-abiding citizen a permit.

The Review Board's reliance upon our decision in *Snowden v. Handgun Permit Review Board,* 45 Md.App. 464, 413 A.2d 295 (1980), contradicts appellant's contention that the Review Board primarily based its denial on the "apprehension of an average person" testimony of Detective Sergeant Galloway. In *Snowden,* the applicant was a community activist, "working in anti-drug and anti-crime programs." *Id.* at 465, 413 A.2d 295. The applicant reported that "he had heard from various people of threats to do him bodily harm." *Id.* He did not, however, provide the names of any persons who had threatened him, nor did he claim that he had ever been assaulted. In the words of the *Snowden* Court, "the information [the applicant] possessed as to the threats was passed to him by others who said they had heard the threats or heard of them." *Id.*

In *Snowden,* we said:

The appellant suggests that the phrase "reasonable precaution against apprehended danger" is the sole criterion for defining "good and substantial reason." He urges that "apprehended danger" is to be viewed from the subjective standpoint of the applicant. Relying on that premise as true, he then states that since a reasonable mind "could not reasonably conclude that Mr. Snowden is not apprehensive of danger," the Board lacked substantial evidence to deny a permit. If we accept Snowden's reasoning there would never be a time when a lawful person, fearful of his safety, would be denied a permit to carry a gun. *Any vague threat would be sufficient to cause apprehension and, thus, the right to have a permit to carry a handgun.* We think the phrase "good and substantial reason," as used in Md. Ann. Code art. 17, § 36E(a)(6), means something more than personal anxiety over having one's name connected publicly

with anti-drug and anti-crime activities. It means, we believe, something more than the concern the individual may have because he has been told by another, that she heard some unidentified men threatening to harm the applicant if he journeys to Meade Village. The statute makes clear that it is the Board[,] not the applicant, that decides whether there is "apprehended danger" to the applicant. If the Act were read as Mr. Snowden would have the court read it, there would be no necessity for a review by the Board. *Each person could decide for himself or herself that he or she was in danger.* The State Police would become a "rubber stamp" agency for the purpose of handing out handgun permits. The carefully considered legislation would be rendered absolutely meaningless insofar as the control of handguns is concerned.

It was reasonable for the Board to consider and give weight to the fact that Snowden did not need a handgun for employment purposes, that he did not know the names of any persons threatening him, that at least one of the threats was relayed to him by a third party, and that the inferences drawn from the facts did not substantiate a valid reason for a permit to be granted.

*Id.* at 469–70, 413 A.2d 295 (footnotes omitted)(emphasis added).

The *Snowden* case provided ample support for the Review Board's conclusion that Scherr's subjective belief that he was in danger did not govern, and it was for the Board to decide whether Scherr, in fact, *reasonably* apprehended danger to himself.

The justification for a denial of a permit to Scherr was much stronger than the justification in *Snowden.* Scherr had never once been threatened by anyone. A reasoning mind could easily conclude, as did the Review Road, that "the degree of apprehended danger to which the applicant is exposed is not sufficient to warrant the issuance of a handgun permit."

■ Scherr gives a second reason in support of his contention that the Review Board's decision was not based upon

substantial evidence. He contends that Detective Sergeant Galloway added, *sua sponte,* an additional requirement that must be satisfied in order for an applicant to obtain a permit. Appellant argues that Detective Sergeant Galloway "requires the production of a police report showing that the [a]pplicant has been threatened." Scherr then points out that

> *Article 27 Section 36E* does not require that additional requirement. The [a]pplication is made under oath. If the [a]pplicant has presented a "good and substantial reason to wear, carry, or transport a handgun," under oath, then requiring corroboration with a police report is also arbitrary and capricious.

At the second hearing before the Board, Galloway testified that he has granted permits to retired police officers who have not been threatened and who have not presented evidence of threats. He stated that "the date that they retired does not mean that someone who they may have arrested the week before or the day before would not seek some type of retaliation against them."

Based on this reasoning, there is no difference in status between a retired police officer and a former prosecutor, who has prosecuted and obtained lengthy jail sentences for violent criminals.

The [a]ppellant testified before the Board that he prosecuted serious felony cases, and obtained jail terms of 20, 30, 40 years to life in prison. Accordingly, criminals who received 30 years or more in jail due to the efforts of Scherr would now be getting released from incarceration. They present the same danger to the [a]ppellant that an arrestee presents to a retired police officer. Galloway's denial of a permit to Scherr, but issuing a permit to a retired police officer who has never been threatened and has not presented evidence of threats, is arbitrary and capricious. The Board's affirming of Galloway's decision was unreasonable.

There are several answers to the above-quoted argument. First, whether Detective Sergeant Galloway should have added a requirement that threats be corroborated by a police

report is irrelevant. Appellant admits that he was never threatened. His position would be identical with, or without, a corroboration requirement. Therefore, whether the added requirement was "arbitrary and capricious" need not be decided.

Second, Scherr's contention that there is no "meaningful" difference in status between a former prosecutor, such as himself, who had "prosecuted and obtained lengthy jail sentences for violent criminals and a retired police officer," has no merit. His entire argument overlooks the fact that Detective Sergeant Galloway testified, without contradiction, that, in granting handgun permits to retired police officers, his decision takes into account a temporal element. The detective said he denied permits to former police officers who had been retired "10, 15, or 20 years ago" because there was no "immediacy" to the threat. Therefore, even assuming, *arguendo*, that the status of former prosecutors is identical to that of former police officers, that similarity would not benefit Scherr, who had not been a prosecutor for a quarter of a century. Former police officers, retired that long, would also be denied permits. Plainly, reasoning minds could conclude that there was no immediacy to any threat posed by former criminals who had been prosecuted by Scherr—just as there would be no immediacy to any threat to a police detective who had been retired for a similar time period.

## B. ISSUE 2

■ Appellant argues:

The Supreme Court has held that the Second Amendment does not apply to the States. It only applies to the Federal Government and Congress. Even if it does not apply to the States, *the Second Amendment recognizes a citizen's right and obligation to arm himself because danger is inherent in our society. Accordingly, the Second Amendment recognizes that "apprehended danger" exists in society and the Second Amendment acknowledges a right of a citizen to arm himself against that danger.* Even if the Second Amendment does not apply to the States, it makes a decla-

ration to the country that apprehended danger exists in everyone's life.

Accordingly, the Handgun Permit Review Board erred in not finding that [a]ppellant had a good reason to carry a handgun. The Second Amendment, at the very least, provides a standard that should have been recognized by the Board. The Board should grant permits to law abiding citizens that meet the background checks provided in Article 27, Section 36E.

(Emphasis added.)

The Second Amendment to the United States Constitution reads:

A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

Appellant's argument can be broken down into four parts: (1) the Second Amendment declares, impliedly at least, that "apprehended danger" exists in our society; (2) the Second Amendment recognizes that a citizen has a right to arm himself against apprehended danger; (3) in considering appellant's application, the Review Board had no choice but to recognize the foregoing constitutional principles and to find that appellant both "apprehended danger" and had a right to bear arms; and (4) therefore, because appellant apprehended danger, had a right to bear arms, and had passed the police criminal-background check, the Review Board erred in failing to grant him a permit.

Appellant's argument is non-meritorious.

Over one hundred years ago, in *Presser v. Illinois,* 116 U.S. 252, 264, 6 S.Ct. 580, 29 L.Ed. 615 (1886), the Supreme Court held:

We are next to inquire whether the fifth and sixth sections of article 11 of the Military Code are in violation of the other provisions of the constitution of the United States relied on by the plaintiff in error. The first of these is the second amendment, which declares: "A well regulated mili-

tia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed."

We think it clear that the sections under consideration, which only forbid bodies of men to associate together as military organizations, or to drill or parade with arms in cities and towns unless authorized by law, do not infringe the right of the people to keep and bear arms. But a conclusive answer to the contention that this amendment prohibits the legislation in question lies *in the fact that the amendment is a limitation only upon the power of congress and the national government, and not upon that of the state. It was so held by this court in the case of U.S. v. Cruikshank, 92 U.S. [2 Otto] 542, 553, 23 L.Ed. 588 [(1875)], in which the chief justice, in delivering the judgment of the court, said that the right of the people to keep and bear arms "is not a right granted by the constitution.* Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed, but this, as has been seen, means *no more than that it shall not be infringed by congress. This is one of the amendments that has no other effect than to restrict the powers of the national government, leaving the people to look for their protection against any violation by their fellow-citizens of the rights it recognizes to what is called* in *City of New York v. Miln,* [36 U.S. 102,] 11 Pet. [102] 139, 9 L.Ed. 648 [(1837)], *the "powers which relate to merely municipal legislation, or what was perhaps more properly called internal police," "not surrendered or restrained" by the constitution of the United States."*

(Emphasis added.)

■ The appellant's assertion that the Second Amendment "makes a declaration to the country that apprehended danger exists in everyone's life" is supported by no authority. And, a plain reading of the Second Amendment shows that it makes no such implied or explicit declaration.

The case of *Onderdonk v. Handgun Permit Review Board,* 44 Md.App. 132, 134–35, 407 A.2d 763 (1979), is apposite. In

*Onderdonk*, Chief Judge Gilbert, in construing the handgun statute here at issue, said for the Court:

> A plethora of cases hold that a statute, such as Maryland's, which reasonably regulates the "right to bear arms" does not violate the Second Amendment's limitation on the federal government.
>
> We note that the bearing of arms was never treated as an absolute right at common law. "It was regulated by statute as to time and place as far back as the Statute of Northhampton in 1328 and on many occasions since." *United States v. Tot*, 131 F.2d 261, 266 (3d Cir.1942), *rev'd on other grounds*, 319 U.S. 463 ... (1943).
>
> The State's regulation of "wearing, carrying and transporting" of handguns is but a modern improvement on the Statute of Northhampton. *It does not violate the Second Amendment because that amendment is not applicable to the States.* The State statute, being a reasonable exercise of police power, is constitutional.

*Id.* (emphasis added) (citations & footnote omitted).

### C. ISSUE 3—DUE PROCESS OF LAW

Appellant next contends that Article 27, section 36E(a)(6), "violates [his] substantive due process rights, depriving him of a liberty and property interest under the Fourteenth Amendment to the federal Constitution."

█ There are several answers to this contention. First and foremost, although many of the rights set forth in the Bill of Rights have been incorporated through the Fourteenth Amendment to place substantive limits on state power, the Second Amendment is not one of them. *See Presser, supra; see also Fresno Rifle and Pistol Club, Inc. v. Van de Kamp*, 965 F.2d 723, 731 (9th Cir.1992) (Second Amendment limits only federal action); *Quilici v. Village of Morton Grove*, 695 F.2d 261, 270 (7th Cir.1982) (same); *United States v. Johnson*, 497 F.2d 548 (4th Cir.1974) (same). No court in any jurisdiction has held otherwise.

■ Second, even if the Fourteenth Amendment right to due process somehow were construed to incorporate the Second Amendment so as to apply it to the states, appellant has identified no substantive right that has been violated. This is fatal to his due process claim.

> [S]ubstantive due process places a restraint on the use of government power beyond that imposed by procedural due process; public officials must grant an individual certain procedural formalities and, in addition, cannot arbitrarily deprive an individual of a constitutionally protected interest even if they follow the proper procedures.

David H. Armistead, Note *Substantive Due Process Limits on Public Officials' Power to Terminate State–Created Property Interests,* 29 GA. L. REV. 769, 774 (1995).

■ As this Court said in *Samuels v. Tschechtelin,* 135 Md.App. 483, 533–34, 537, 763 A.2d 209 (2000):

> [S]ubstantive due process "provides heightened protection against government interference with certain *fundamental rights and liberty interests." Washington v. Glucksberg,* 521 U.S. 702, 720, ... (1997).

Whether appellant was deprived of a protected property interest in violation of substantive due process turns on whether an alleged state-law contract right is so fundamental as to require substantive due process protections.

* * *

■ Consistent with the preceding discussion, the Supreme Court has "observed that the Due Process Clause specifically protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Glucksberg,* 521 U.S. at 720–21 ... (citations omitted). Moreover, analysis of an alleged substantive due process violation *"must begin with careful description of the asserted right, for '[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.'"*

*Reno v. Flores,* 507 U.S. 292, 302, . . . (1993) (alteration in original) (quoting *Collins v. Harker Heights,* 503 U.S. 115, 125, . . . (1992)). Whether a challenged state action implicates a *fundamental right* is a threshold determination. *Glucksberg,* 521 U.S. at 722. . . .

Under Supreme Court jurisprudence, in addition to those freedoms enumerated in the federal Bill of Rights, an individual's Fourteenth Amendment liberty interest "includes the right to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." Id. at 720 . . . (citations omitted); cf. In re Adoption/Guardianship No. TPR970011, 122 Md.App. 462, 473, 712 A.2d 597 . . . (1998) (acknowledging that "the fundamental right of a parent to raise his or her child is in the nature of a liberty interest that is protected under" Article 24 and the Fourteenth Amendment).

(Emphasis added.)

While Scherr does not explicitly identify any fundamental right or liberty that was violated and that was protected by the right of substantive due process, he presumably contends that the right to wear, carry, or transport a handgun is a "fundamental right." Scherr fails, however, to offer any support for this implied contention. The right to bear arms was "never treated as an absolute right at common law." *Onderdonk,* 44 Md.App. at 134, 407 A.2d 763.

■■■ Even if Scherr had a liberty interest, protected by the Fourteenth Amendment, to bear arms, his attack on the gun permit law would not succeed unless he met his burden of showing that the statute does not "bear a real and substantial relationship to the governmental object sought to be attained." *Office of People's Counsel v. Maryland Public Service Comm'n,* 355 Md. 1, 26–27, 733 A.2d 996 (1999).

Scherr contends he met this burden. According to appellant, Article 27, section 36E(a)(6), "has no real or substantial relation to the public health, morals, safety, and welfare of citizens."

In support of that argument, he cites the case of *Daniel Loughran Company, Inc. v. Lord Baltimore Candy & Tobacco Company, Inc.*, 178 Md. 38, 12 A.2d 201 (1940). In the *Loughran* case, the Court scrutinized a law that prevented a retailer from advertising, offering to sell, or selling at retail "any item of merchandise at less than cost to the retailer as defined in" the Act. *Id.* at 42, 12 A.2d 201. The Court pointed out that at "common law the right of the individual to dispose of his property or his services at such price as he and the purchaser may agree upon is firmly established, and inasmuch as the Act now under consideration is in derogation of that common right, it must be strictly construed." *Id.* at 44, 12 A.2d 201. The *Loughran* Court went on to say the "guarantee of due process simply demands that the law shall not be unreasonable, arbitrary or capricious, and that *the means selected shall have a real and substantial relation to the object sought to be attained.*" *Id.* Nevertheless, "[w]ithin the above limitation[ ], 'a state is free to adopt and enforce whatever economic policy may reasonably be deemed to promote public welfare, whether by promoting free competition by laws aimed at monopolies or by curbing harmful competition by fixing minimum prices.'" *Id.*

According to appellant, principles enunciated in *Loughran* are here relevant because the object sought to be obtained by the enactment of Article 27, section 36E, was solely to prevent "criminals from carrying guns." To support this contention, he relies on the expression of legislative intent set forth in sections 4–202 and 4–203 of the Criminal Law Article, the statutes that prohibit, with certain exceptions, the wearing, carrying, or transporting of handguns. Appellant further asserts that the legislature intended to prevent only previously *convicted* criminals from obtaining handguns. Section 4–202 reads:

The General Assembly finds that:

(1) the number of violent crimes committed in the State has increased alarmingly in recent years;

(2) a high percentage of violent crimes committed in the State involves the use of handguns;

(3) the result is a substantial increase in the number of deaths and injuries largely traceable to the carrying of handguns in public places *by criminals;*

(4) current law has not been effective in curbing the more frequent use of handguns in *committing crime;* and

(5) additional regulations on the wearing, carrying, and transporting of handguns are necessary to preserve the peace and tranquility of the State and to protect the rights and liberties of the public.

Subsections 4–202(1), (2), and (4) speak of the commission of crimes with handguns, but the language does not suggest that the individuals engaged in those acts are necessarily convicted criminals. Quite obviously, many crimes committed by persons using firearms are committed by persons who have had no prior criminal convictions. If the legislature had intended that only convicted criminals should be denied handguns, we can think of no reasons why it would not have said so.[2] Also, if the legislature had intended to deny only convicted criminals from being given gun permits, it would not have prohibited the issuance of a permit to those mentioned in Article 27, section 36E(a)(1), (3), (5), and (6), quoted *supra.*

 Appellant also argues:

Section 4–203 contains several exceptions, and *does allow a law abiding citizen to wear and carry a gun, without a permit, when doing the following: When traveling between*

---

**2.** Additionally, we note that the Court of Appeals recently said:

Statutes are generally presumed to be Constitutional and are not to be held otherwise unless the Constitutional impediment is clear. We have said many times that "since every presumption favors the validity of a statute, it cannot be stricken down as void, unless it plainly contravenes a provision of the Constitution." *McGlaughlin v. Warfield,* 180 Md. 75, 78, 23 A.2d 12, 13 (1941)[,] and cases cited there; *see also Atkinson v. Sapperstein,* 191 Md. 301, 315, 60 A.2d 737, 742 (1948); *Edgewood Nursing Home v. Maxwell,* 282 Md. 422, 427, 384 A.2d 748, 751 (1978); *State v. Wyand,* 304 Md. 721, 727–28, 501 A.2d 43, 46–47 (1985); *Galloway v. State,* 365 Md. 599, 610–11, 781 A.2d 851, 857–58 (2001).

*Maryland State Board of Education v. Bradford, et al.,* 387 Md. 353, 387, 875 A.2d 703 (2005).

*bona fide residences; when traveling between the residence and place of business; when traveling to and from target practice; when traveling to or from a dog obedience training class or show, etc.*

Apparently, the legislature thinks that public safety is not jeopardized when a gun owner transports his gun to a dog obedience training class, or to target practice. If a law abiding citizen is qualified to own a gun, transport it to his business, take it to target practice, and take it to these other activities, all without a permit, then it is arbitrary and unreasonable for the Handgun Permit Review Board to deny [a]ppellant a permit to carry a gun at any other time.

(Emphasis added.)

The aforementioned argument has no merit. It overlooks the fact that those without a permit must carry the weapon in an enclosed case or in a holster and without ammunition. No such restrictions are imposed upon those issued a permit to carry a handgun.

### D. ISSUE 4—ALLEGED VIOLATION OF SECOND AMENDMENT

Citing *United States v. Emerson,* 270 F.3d 203 (5th Cir.2001), appellant argues:

The [a]ppellant does not need a good and substantial reason to carry a handgun because the Second Amendment gives him that right. Accordingly, that portion of Section 36E is unconstitutional. The remaining portion of Section 36E requiring background checks is permissible.

*Emerson,* a 2–1 decision by a panel of the U.S. Court of Appeals for the Fifth Circuit, held that the Second Amendment established a fundamental individual right to bear arms, regardless of membership or service in a militia. *Emerson,* 270 F.3d at 260. But, in doing so, the *Emerson* court recognized that it stood alone among all the federal circuit courts in recognizing an individual right to bear arms under the Second Amendment. Since *Emerson* was decided, the Fifth Circuit is still the only federal court to adopt the view that the Second

Amendment gives an individual the right to bear firearms. *See Parker v. District of Columbia,* 311 F.Supp.2d 103, 107 (2004), and cases therein cited. The majority of courts have interpreted Supreme Court precedent, and the Constitution itself, as applying only to the right of the State to maintain a militia and not to the individual's right to bear arms. *See, e.g., Love v. Pepersack,* 47 F.3d 120, 124 (4th Cir.1995). "[T]here can be no serious claim to any express constitutional right of an individual to possess a firearm." *United States v. Warin,* 530 F.2d 103, 106 (6th Cir.1976); *Stevens v. United States,* 440 F.2d 144, 149 (6th Cir.1971) (same). The decision also seems to contradict language by the Supreme Court in *United States v. Cruikshank,* 92 U.S. (2 Otto) 542, 553, 23 L.Ed. 588 (1875), quoted with approval by the court in *Presser, supra,* that the right of the people to bear arms "is not a right granted by the [C]onstitution." *Presser,* 116 U.S. at 265, 6 S.Ct. 580. But, even if we were to follow the lead of the *Emerson* Court and hold that the Second Amendment recognizes an individual's right to bear arms, the outcome of this case would not change. *Emerson* dealt with the violation of a *federal* statute (18 U.S.C. § 922), which prohibited, *inter alia,* a person subject to a court order from possessing "any firearm or ammunition." *Emerson* in no way has any bearing on the Supreme Court ruling that the Second Amendment only restricts the power of the U.S. Congress. The Second Amendment imposes no restriction upon the state's power to enact legislation. *Id.*

## VI.

██ Appellant's final argument is:

Article 2 of the Declaration of Rights adopts the Second Amendment of the United States Constitution. Article 2 states the following:

"The Constitution of the United States, and the laws made, or which shall be made, in pursuance thereof, . . . are, and shall be the supreme law of the State; and the Judges of the State, and all the people of the State, are, and shall be bound thereby; anything in the Constitution or law of the State to the contrary notwithstanding."

Article 28 of Maryland's Declaration of Rights incorporates the Second Amendment. Article 28 states the following:

"Militia—that a well-regulated militia is the proper and natural defense of a free government."

According to *Emerson*, militia means that the State's citizens have the right and obligation to bear arms. The *Emerson* court further discussed what was meant in the Second Amendment by the term "militia[.]" The *Emerson* court stated: "The militia comprised all males physically capable of acting in concert for the common defense. Ordinarily when called for service, these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." The [c]ourt further states: "The militia consisted of the people bearing their own arms when called to active service, arms which they kept and hence knew how to use. If the people were disarmed, there could be no militia as it was then understood."

Contrary to appellant's assertion, the *Emerson* case does not say that "militia means that the [s]tate's citizens have the right and obligation to bear arms." Moreover, Article 2 of the Declaration of Rights does not "adopt" the Second Amendment or any other amendment to the federal Constitution; it simply recognized that the provisions of the United States Constitution supersede any law enacted by the General Assembly. But because the Second Amendment only restricts the power of Congress to enact certain types of laws, it is here irrelevant because appellant challenges the right of Maryland to make laws.

▮ The Maryland Declaration of Rights is silent as to the right to bear arms. And, neither the *Emerson* case nor any other case supports the proposition that the mere fact that a constitution provides for the establishment of a militia means that the citizens have a right to bear arms.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**