*Erik Belfiore v. Merchant Link, LLC*
No. 2043, September Term 2016
Opinion by Nazarian, J.

**HEADNOTES**

EMPLOYMENT DISCRIMINATION – MONTGOMERY COUNTY CODE § 27-19(a)(1)(A) – DISCRIMINATION BASED ON RACE – COMPENSATION – PRIMA FACIE CASE

The Case Review Board of the Montgomery County Office of Human Rights did not err in affirming the hearing examiner's report and recommendation finding that the petitioner had established a *prima facie* case of discrimination with respect to compensation under Montgomery County Code § 27-19(a)(1)(A). To establish a *prima facie* case of discrimination under that section, a petitioner must prove that he (1) is a member of a protected class, (2) performed work substantially similar to those outside the protected class, and (3) was paid less than those outside the protected class. Mr. Belfiore successfully established that he (1) is African-American (and thus a member of a protected class) and (2) was paid less than those who had substantially similar positions within the company who were "'white" or Indian" and (3) thus outside the protected class.

EMPLOYMENT DISCRIMINATION – MONTGOMERY COUNTY CODE § 27-19(a)(1)(A) – DISCRIMINATION BASED ON RACE – COMPENSATION – BURDEN OF PROOF

The Case Review Board of the Montgomery County Office of Human Rights did not err in affirming the hearing examiner's report and recommendation finding that the petitioner had failed to meet his burden of proof under Montgomery County Code § 27-19(a)(1)(A) to establish a claim for discrimination with respect to compensation. Mr. Belfiore failed to produce evidence sufficient to establish that the employer's reasons for differences in compensation were pretextual, and were in fact caused by racial discrimination.

EMPLOYMENT DISCRIMINATION – MONTGOMERY COUNTY CODE § 27-19(c)(1) – DISCRIMINATION BASED ON RACE – RETALIATION – PRIMA FACIE CASE

The Case Review Board of the Montgomery County Office of Human Rights did not err in affirming the hearing examiner's report and recommendation finding that the petitioner had established a *prima facie* case of retaliation under Montgomery County Code § 27-19(c)(1). To establish a *prima facie* case of retaliation under that section, a petitioner must prove that (1) he engaged in a protected activity, (2) the employer took adverse action against him, and (3) the adverse action was causally connected to the employee's protected activity. Petitioner successfully established that (1) he engaged in a protected activity by

writing an email to his employers threatening legal action over his allegedly discriminatory compensation, (2) he suffered an adverse employment action in that his employment was terminated, and that (3) the close temporal proximity between his protected activity (three weeks) can support a presumption that the protected activity and the termination of his employment caused the firing.

EMPLOYMENT DISCRIMINATION – MONTGOMERY COUNTY CODE § 27-19(c)(1) – DISCRIMINATION BASED ON RACE – RETALIATION – BURDEN OF PROOF

The Case Review Board of the Montgomery County Office of Human Rights did not err in affirming the hearing examiner's report and recommendation finding that the petitioner had failed to meet his burden of proof under Montgomery County Code § 27-19(c)(1) to establish a claim for retaliation. Petitioner failed to produce evidence sufficient to establish that employer's reasons for firing him were pretextual, and were in fact motivated by his protected activity (*i.e.*, threatening legal action over his allegedly discriminatory compensation).

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 02043

September Term, 2016

_____

ERIK BELFIORE

v.

MERCHANT LINK, LLC

_____

Nazarian,
Shaw Geter,
Fader,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: March 1, 2018

Erik Belfiore served in various executive positions at Merchant Link, LLC ("Merchant Link") over a period of six years, and rose ultimately to the position of Chief Operating Officer. In 2011, he sought a pay increase, and the company was considering it. Before a final decision was made, though, he was terminated after he tried, the company contends, to sabotage an important company project. He challenged his termination in the Montgomery County Office of Human Rights ("OHR"), alleging that he had been fired and, before that, denied the pay increase, on the basis of race. After a six-day evidentiary hearing, a hearing examiner found that Merchant Link had established non-discriminatory reasons to justify his pay and termination. The Circuit Court for Montgomery County affirmed OHR's decision, and we affirm it as well.

## I. BACKGROUND

Merchant Link is headquartered in Silver Spring and serves as an electronic intermediary between credit card issuers and merchants. The company uses proprietary systems to process and provide security for up to five billion credit card transactions per year. Merchant Link hired Mr. Belfiore in September 2005 as a financial analysis manager, and he served as Merchant Link's chief operating officer ("COO") from mid-2008 until November 2011.

In December 2008, after some corporate restructuring, Merchant Link became a joint venture owned by the company's two major clients, Chase Paymentech ("Chase") and First Data Corporation ("First Data") and managed by a board of managers (the "Board") that consisted of Chase and First Data executives. The Board was responsible for approving

the appointment and replacement of Merchant Link officers and for setting officer compensation.

Shortly before the corporate restructuring, in May 2008, Mr. Belfiore had been appointed as Merchant Link's COO. Mr. Belfiore replaced Dan Lane, an original employee of the company who was appointed Chief Technology Officer ("CTO"). At its first meeting in 2008, the Board elected Messrs. Belfiore and Lane and Christopher Justice, who had been the company's president before the restructuring, as "officers" of the new joint venture. Mr. Belfiore remained COO, Mr. Lane remained CTO, and Mr. Justice was elected Chief Executive Officer ("CEO").

Mr. Justice resigned in March 2009 and was replaced as CEO on an "interim" basis by Board member Daniel Charron. During this period, Mr. Charron remained at his office in Dallas and delegated day-to-day operational control to Mr. Belfiore, Mr. Lane, and Timothy Kinsella, the executive vice president for sales. Mr. Charron served as interim CEO for approximately two years. In April 2011, Mr. Lane took over as CEO.

At its first meeting in December 2008, the Board created a compensation committee, and appointed two of its members, Mr. Charron and Barry McCarthy, to serve on it. Mr. Belfiore asserts that Messrs. Charron, McCarthy, and Lane discriminated against him based on his race (he is African-American) in setting his compensation between 2009 and 2011, and that Mr. Lane retaliated against him by firing him when Mr. Belfiore threatened legal action over his pay.

Merchant Link had a somewhat complex compensation system. Each employee was assigned a grade, but each grade has a broad salary range, and a lower-grade employee

2

might earn more than a higher-grade one. Salaries were supplemented by two bonus plans: the "annual incentive plan" ("AIP") bonus and "long term incentive plan" ("LTIP") grants. AIP bonuses were a percentage of total salary and increases based on grade. LTIP grants were awarded from a pool of money tied to the company's overall economic performance. The amount of the pool was proposed initially by the CEO to the Board; once approved, the CEO had broad flexibility to set individual awards.

Mr. Belfiore received raises throughout the period from 2008 to 2011. His salary went from approximately $105,000 in 2008 to $130,000 in 2011. His AIP bonuses and LTIP grants increased his overall compensation in 2009 and 2010 by more than $90,000 in each of those years, and he received a total of $195,000 between salary and bonuses in 2011 before he was fired in November of that year.

In August 2011, after Mr. Belfiore had requested a raise after negotiations, Mr. Lane agreed to raise Mr. Belfiore's salary from $130,000 to $172,000, and the raise went into effect for two pay periods. But on October 6, 2011, Mr. Lane heard from Merchant Link's chief financial officer that the increase needed Board approval, and that the higher payments needed to be recouped, at least temporarily. Mr. Lane gave Mr. Belfiore this news and assured him he would try to persuade the compensation committee (*i.e.*, Messrs. Charron and McCarthy) to approve the raise.

On October 11, Mr. Lane asked human resources director Wendy Nussbaum to prepare a request to the compensation committee to increase Mr. Belfiore's salary. Ms. Nussbaum did so, and included information about the salaries of positions at Merchant

3

Link that could be considered comparable to COO, as well as a survey of local and nationwide COO compensation.

On October 13, Mr. Lane wrote to Mr. McCarthy to recommend that the company pay Mr. Belfiore at the higher rate. Mr. Lane also informed Mr. McCarthy that Mr. Charron would support the request. After some back-and-forth with Mr. Lane, on the phone and via email, Mr. McCarthy wrote to Mr. Lane on October 20 and denied the increase, pending deliberations by the compensation committee. Mr. McCarthy asked Mr. Lane to schedule a committee meeting.

On October 21, Mr. Belfiore sent an email to Messrs. Charron, McCarthy, and Lane, complaining that his compensation was not adequate and attributing the shortfall to "your actions and inaction" stemming from racial discrimination. Mr. Belfiore wrote that he had no choice but "to initiate the process of identifying a suitable legal resolution." It was not until he received this email that Mr. McCarthy (a First Data executive) became aware that Mr. Belfiore is African-American.

On October 25, the compensation committee met, and, according to an email from Mr. Lane to Messrs. McCarthy, Charron, Nussbaum, and to Merchant Link's outside counsel Harry Jones, requested additional information about Mr. Belfiore's historical compensation, his role at the company, and other executive compensation. Mr. Lane stated in the email that he would schedule another committee meeting, but the committee never met before Mr. Belfiore's employment was terminated twelve days later.

On November 8, Mr. Belfiore called a lower-level employee, Renee Dantzler, into his office. According to Ms. Dantzler, Mr. Belfiore asked her for help in undermining the

4

company's new customer relations management ("CRM") system, used profanity, and upset her. The following day, Ms. Dantzler reported the meeting to her supervisor Zack Minton, and on November 10, put the incident in writing to Ms. Nussbaum; Mr. Minton also wrote an email to Ms. Nussbaum and Mr. Lane about the incident. No one talked to Mr. Belfiore.

On November 11, Mr. Lane fired Mr. Belfiore. Messrs. McCarthy and Charron testified that the Board had approved the termination (although no evidence of a Board meeting concerning the termination exists, and Merchant Link did not call the two other Board members to testify at the administrative hearing we will describe shortly).

Mr. Belfiore filed a complaint in December 2011 in the Montgomery County Office of Human Rights ("OHR"). The Case Review Board of the OHR's Commission on Human Rights (the "Commission") referred the case for a hearing before the Office of Zoning and Administrative Hearings. After discovery, a hearing examiner conducted a six-day evidentiary hearing. Ten witnesses testified and two transcripts were admitted into evidence. The hearing examiner issued a seventy-eight-page opinion on August 17, 2015, recommending that the Commission find that Mr. Belfiore failed to prove his claims under sections 27-19(a)(1) and 27-19(c)(1) of the Montgomery County Code. The Case Review Board issued a final Decision and Order affirming the hearing examiner's report and recommendation. We will discuss the Decision and Order in greater detail in the Discussion below.

On June 6, 2016, Mr. Belfiore sought judicial review of that decision in the Circuit Court for Montgomery County. The circuit court affirmed the Case Review Board's

5

decision on November 16, 2016. This Court reviews the agency decision, which in this case is the hearing examiner's report and recommendation, as adopted in full by the agency. *Flaa v. Manor Country Club*, 158 Md. App. 483, 494 (2004), *rev'd on other grounds*, 387 Md. 297 (2005).

## II. DISCUSSION

Mr. Belfiore argues on appeal[1] that the hearing examiner erred in finding that he failed to establish his discriminatory compensation and retaliation claims.[2] "On appellate review of the decision of an administrative agency, this Court reviews the agency's decision, not the circuit court's decision." *Long Green Valley Ass'n v. Prigel Family*

---

[1] We have jurisdiction to hear this appeal under Md. Code Ann., Courts and Judicial Proceedings Article ("CJ"), § 12-302(a) because it is a case in which the circuit court engaged in "ordinary judicial review of a final adjudicatory decision by an administrative agency." *Prince George's County v. Beretta U.S.A. Corp.*, 358 Md. 166, 175 (2000). The right to appeal arises in this case from §§ 27-7 and 2A-11 of the Montgomery County Code. *Kant v. Montgomery County*, 365 Md. 269, 277 (2001).

[2] Mr. Belfiore phrased the Questions Presented in his brief as follows:

> I. Whether Respondent Merchant Link intentionally suppressed the level of the Petitioner Belfiore's compensation to a pay level substantially lower than the required level of a Corporate Officer and below the level of non-officer "Executives" on a lower level of the organization with lower level of responsibilities.
>
> II. Whether Respondent Merchant Link's termination of Belfiore was motivated by Belfiore's Protected Activity when: (1) Petitioner engages in protected activity, (2) an employee makes an unsubstantiated claim against Petitioner, (3) respondent disregards all procedures required under the employee handbook regarding investigation of claims against petitioner, and (4) respondent terminates the petitioner under the pretext that his undocumented "abrasive behavior" warranted immediate action.

*Creamery*, 206 Md. App. 264, 273–74 (2012) (cleaned up). "[W]e apply a limited standard of review and will not disturb an administrative decision on appeal if substantial evidence supports factual findings and no error of law exists." *Id.*; *accord Flaa*, 158 Md. App. at 494–95.

The substantial evidence test looks at "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Board of Physician Quality Assurance v. Banks*, 354 Md. 59, 68 (1999) (quoting *Bulluck v. Pelham Wood Apts.*, 238 Md. 505, 512 (1978)). "The reviewing court also must review the agency's decision in the light most favorable to the agency, since decisions of administrative agencies are *prima facie* correct and carry with them the presumption of validity." *Baltimore Lutheran High School Assoc., Inc. v. Employment Security Admin.*, 302 Md. 649, 662–63 (1985) (citing *Bulluck*, 238 Md. at 512–13). "A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record." *Banks*, 354 Md. at 68 (citing *CBS v. Comptroller*, 319 Md. 687, 698 (1990)); *Baltimore Lutheran High School*, 302 Md. at 662–63 ("Furthermore, not only is it the province of the agency to resolve conflicting evidence, but where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences.") (citing *Bulluck*, 238 Md. at 512–13); *accord Maryland Aviation Admin. v. Noland*, 386 Md. 556, 572–73 (2005).

When deciding issues of law, our review is more expansive, although the agency's interpretation of a statute that the agency administers "should ordinarily be given considerable weight by reviewing courts." *Banks*, 354 Md. at 69 (citations omitted). And our review of mixed law and fact asks "whether a reasoning mind could reasonably have

reached the conclusion reached by the agency, consistent with a proper application of the controlling legal principles." *State Comm'n on Human Relations v. Kaydon Ring & Seal, Inc.*, 149 Md. App. 666, 692 (2003) (cleaned up).

### A. The Commission Did Not Err In Denying Mr. Belfiore's Claim For Discriminatory Compensation.

Mr. Belfiore argues *first* that the hearing examiner erred in finding against him on his claim for discriminatory compensation under Montgomery County Code § 27-19(a)(1)(A). That section prohibits employers from "discriminat[ing] against any individual with respect to compensation, terms, conditions, or privileges of employment" because of the individual's race. To prove a violation of this section, Mr. Belfiore relies on the "disparate treatment" theory, which "is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15 (1977). Claims of disparate treatment may be proven by direct or circumstantial evidence. *Dobkin v. Univ. of Baltimore Sch. of Law*, 210 Md. App. 580, 591–92 (2013). The parties agree that there is no direct evidence of racial discrimination here, and in cases where the evidence of discrimination is circumstantial rather than direct, Maryland courts apply the three-step burden-shifting analysis first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Dobkin*, 210 Md. App. at 592–93.

At the first step, the employee must establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 253; *Texas Dept. of Community Affairs v. Burdine*,

8

450 U.S. 248, 253 (1981). Mr. Belfiore can meet this initial burden by proving that he is a member of a protected class, that he performed work substantially similar to those outside the protected class, and that he was paid less than those outside the protected class. *Kess v. Municipal Employees Credit Union of Baltimore, Inc.*, 319 F. Supp. 2d 637, 644 (D. Md. 2004); *see Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994).[3] If he meets that burden, a presumption arises "that the employer unlawfully discriminated against the employee." *Burdine*, 450 U.S. at 254.

At Step 2, the employer can rebut the *prima facie* case by presenting evidence of "some legitimate, nondiscriminatory reason" for the alleged disparate treatment. *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254. "'[T]he defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993) (emphasis in original) (quoting and citing *Burdine*, 450 U.S. 254–55 and n. 8). Importantly, "although the *McDonnell Douglas* presumption shifts the burden of *production* to the defendant, '[t]he ultimate burden of persuading the trier of fact that the

---

[3] Section 27-1(b) of the Montgomery County Code notes that "[t]he prohibitions in this article are substantially similar, but not necessarily identical, to prohibitions in federal and state law." Maryland courts interpreting state and county laws prohibiting discrimination have generally found federal decisions construing comparable federal laws persuasive, if not absolutely determinative. *E.g.*, *Taylor v. Giant of Md., LLC*, 423 Md. 628, 652 (2012); *Chappell v. Southern Md. Hosp., Inc.*, 320 Md. 483, 494 (1990); *Edgewood*, 212 Md. App. at 200, n.8.

defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id*. (quoting *Burdine*, 450 U.S. at 253).

If Merchant Link succeeds at Step 2, Mr. Belfiore "must then have an opportunity to prove by a preponderance of the evidence that the reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. To succeed in meeting his or her ultimate burden of persuasion, the plaintiff must prove that the proffered reasons were pretextual or unworthy of credence "*and* that discrimination was the real reason." *Hicks*, 509 U.S. at 515 (emphasis in original). Put another way, the first step's presumption of discrimination "simply drops out of the picture," *id*. at 511, and the plaintiff employee retains the burden of persuasion to prove, by a preponderance of the evidence, that he or she "has been the victim of intentional discrimination." *Id.* at 508 (quoting *Burdine*, 450 U.S. at 256).

The hearing examiner found that Mr. Belfiore succeeded in establishing a *prima facie* case of discriminatory compensation and that Merchant Link successfully proffered legitimate reasons for the differences in compensation. But the hearing examiner ultimately found that Mr. Belfiore failed to prove, by a preponderance of the evidence, that Merchant Link's proffered reasons were pretextual or that Mr. Belfiore's relatively lower compensation was due to any racial discrimination by Merchant Link. Mr. Belfiore challenges the hearing examiner's analysis of the second and third steps, but we discern no error on this record.

Before addressing Mr. Belfiore's particular arguments, though, we need to walk through the hearing examiner's findings. At the first step, the hearing examiner found that

10

Mr. Belfiore, who is African-American (and thus a member of a protected class) demonstrated that he was paid less than similarly situated counterparts. The hearing examiner based that finding on two things: that (1) Mr. Belfiore "was one of only three second-tier executives" and the other two (Messrs. Lane and Kinsella) "out-earned him considerably" and (2) other employees lower in the hierarchy earned more than Mr. Belfiore did. The employees whose salaries were compared to Mr. Belfiore's were "'white' or Indian." The examiner also found that Mr. Belfiore's *prima facie* case was "bolster[ed]" by at least four other conclusions:

- In 2008, Mr. Charron refused to increase Mr. Belfiore's salary to match Mr. Lane's, "relying on a purported policy" that disallowed raises that were more than 10%, but that "so far as the record shows, did not exist;"

- Even though Mr. Belfiore supervised half or more of Merchant Link's employees, Merchant Link raised his pay grade only to "a mid-range management level," and, when the grade was ultimately raised to the highest level, it was without retroactive salary or AIP bonus adjustments;

- Mr. Lane hired three new employees (Messrs. Smith, Kirby-Meck, and Sutherland) whose salaries were set "well above the $130,000 [salary] that Mr. Belfiore was earning;" and

- The Board did not approve Mr. Belfiore's $42,000 salary raise in 2011 by the time he was fired.

The hearing examiner continued his analysis at the second and third steps, finding that Merchant Link "gave reasons for the compensation disparities and the practices that created them," and that Mr. Belfiore had failed to produce evidence sufficient to establish that those reasons were pretextual. *First*, with respect to Mr. Lane as a comparator, the hearing examiner found that Mr. Belfiore's compensation as COO was less than Mr. Lane's had been in that position "because the departments and personnel transferred from Lane to Belfiore were only a subset of those Mr. Lane had supervised" and because Mr. Lane had

been an original employee, if not co-founder, of the company and a contributor to some of its technology. *Second*, the examiner found legitimate Merchant Link's explanation that the other two groups of comparators—executives (Messrs. Kinsella and Smith) and technology employees (Messrs. Konar, Chudasama, and Zloth)—had different skills and responsibilities that warranted higher compensation.

Mr. Belfiore characterizes the hearing examiner's analysis at this stage as "deficient." But it is not our role to weigh the evidence for ourselves, and the record and the examiner's decision reveal a thorough and careful review and analysis of the evidence Mr. Belfiore presented. In discussing the comparator evidence, for example, the hearing examiner specifically addressed Mr. Belfiore's arguments that Merchant Link's proffered reasons were a pretext for racial discrimination. The hearing examiner credited the company's testimony that job title alone did not determine salary, and that job duties drove the process as well. He found that Mr. Lane's salary reflected his status as a co-founder or original employee and the fact that his responsibilities as COO were broader in scope than Mr. Belfiore's in the same role. And he found no evidence to support the claim that the other two groups of comparators (*i.e.*, executives and technical employees) had different responsibilities that did not deserve higher compensation. Merchant Link acknowledged all along that Mr. Belfiore was not being paid as much as he should have been. But it didn't follow, as the examiner found, that Mr. Belfiore necessarily should have been earning as much as Mr. Lane or the other two groups of comparators, nor that any discrepancy was a function of racial discrimination.

Mr. Belfiore also argues that the hearing examiner improperly required him to produce "direct evidence" of racial discrimination.[4] We disagree. After examining the comparator evidence, the examiner looked closely at the record and examined whether Mr. Belfiore had proven that his pay disparity was caused by race discrimination, as *McDonnell Douglas* required. *See Hicks*, 509 U.S. at 511, 515. The hearing examiner found that Belfiore had not met his burden.

In particular, the hearing examiner looked closely at the evidence and testimony relating to Messrs. Lane, McCarthy, and Charron, who made the decisions about Mr. Belfiore's compensation. Mr. Belfiore characterized Mr. Lane's efforts in 2011 to raise Mr. Belfiore's salary by $42,000 as a "ruse," suggesting that Mr. Lane approved the raise knowing that the Board or compensation committee would retract it. The hearing examiner found insufficient evidence to support that theory, and credited the testimony of Ms. Nussbaum (who no longer worked at Merchant Link at the time she testified, which boosted her credibility in his view) that Mr. Lane was not aware he couldn't unilaterally raise Mr. Belfiore's salary.

The examiner went on to observe that there was "no evidence that Mr. McCarthy acted with racial animus." The examiner believed Mr. McCarthy's testimony that "he didn't know Mr. Belfiore's race and presumed he was Italian until he learned differently

---

[4] He states in his brief that "[t]he significant portion of the hearing examiner analysis was supporting the proffered reasons for the pay disparity not being racially motivated putting enormous and unreasonable pressure on Belfiore to provide direct evidence that race was the reason for his unlawfully low salary."

on October 21." And the examiner found that Mr. McCarthy's "pre-October 21 emails show[ed] that he objected to an immediate raise because he wanted a broader discussion of compensation at Merchant Link" and that it was "reasonable" for McCarthy to raise questions about the $42,000 (32+ percent) raise.

*Finally*, the hearing examiner reviewed Mr. Charron's testimony, which he characterized as "more shadowy," but which he determined ultimately did not support a finding that Mr. Charron had acted with racial animus. The examiner was critical of Mr. Charron's claims that he did not remember his actions during relevant periods and of Merchant Link's failure to call him as a live witness. And he characterized as "established" the fact that Mr. Charron "stood in the way of granting Mr. Belfiore a raise in 2008 and 2009," and he credited Mr. Justice's testimony that in 2008, Mr. Charron had relied on a purported policy that disallowed raises that were more than 10% to deny Mr. Belfiore a larger raise (although the record did not reveal whether that policy actually existed). But in the end, the examiner was persuaded by four key facts that the pay disparity was not caused by racial discrimination:

- Mr. Belfiore himself testified that Mr. Charron "had been upset when he learned that Mr. Belfiore's LTIP grant had only been $8,000 [in 2007] and took steps to raise it to $50,000 in the following year," and Mr. Charron had initiated Mr. Belfiore's $14,000 raise in 2009;

- Mr. Belfiore's relatively high LTIP grants ($75,000) in 2008, 2009, and 2011 had been expressly authorized by Mr. Charron and significantly increased his overall compensation;

- Mr. Belfiore received the highest LTIP award in the company in 2011 (other than Mr. Lane) during the time when Mr. Charron was still the CEO (*i.e.*, before he was replaced by Mr. Lane in April); and

- Mr. Charron supported Mr. Lane's request to raise Mr. Belfiore's salary by $42,000 in 2011.

Mr. Belfiore cites circumstantial evidence that, in his view, support the opposite result.[5] To get where he wants us to go, though, we would need to re-weigh evidence and draw new and different inferences than those reasonably drawn by the hearing examiner. Our job here is to determine "whether a reasoning mind could reasonably have reached the conclusion reached by the agency, consistent with a proper application of the controlling legal principles." *Kaydon Ring*, 149 Md. App. at 692 (cleaned up). And on this record, a reasoning mind could well have reached the conclusion that the hearing examiner reached.

## B. The Commission Did Not Err In Denying Mr. Belfiore's Retaliation Claim.

*Next*, Mr. Belfiore argues that the hearing examiner erred in denying his retaliation claim under Montgomery County Code § 27-19(c)(1), which provides that "[a] person must not: (1) retaliate against any person for: (A) lawfully opposing any discriminatory practice prohibited under this division; or (B) filing a complaint, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under this division." Mr. Belfiore asserts that the retaliation occurred when he was terminated after raising his pay discrimination claim.

---

[5] Mr. Belfiore argues that: (1) his salary should have matched Mr. Lane's, and that Mr. Lane is an appropriate comparator; (2) Merchant Link was not a "technology" company, but a "service" company, and his duties on the service side of the company should have been valued more highly; (3) Mr. Belfiore was not, in fact, the second-highest paid employee in 2011; and (4) other executive and technical employees were appropriate comparators and weren't considered.

The *McDonnell Douglas* burden-shifting standard applies to retaliation claims under the Montgomery County Code as well. *Edgewood Mgmt. Corp. v. Jackson*, 212 Md. App. 177, 199–200 (2013). To establish a retaliation claim, the employee must first establish a *prima facie* case by producing evidence that (1) the employee "engaged in a protected activity;" (2) the "employer took an adverse action against [the employee];" and (3) the "adverse action was causally connected to [the employee's] protected activity." *Id.* at 199 (citations omitted). If he succeeds in establishing a *prima facie* case, the burden shifts to the employer to offer evidence of "a non-retaliatory reason for the adverse employment action." *Id.* at 200 (citations omitted). If the employer meets its burden, "the burden of production shifts back to [the employee] to show that the proffered reasons for the employment action were a mere pretext." *Id.* (citation omitted). Establishing pretext is only the initial step of the remainder of the analysis, however. As with the compensatory discrimination claim, the plaintiff retains the burden of proving that he was the victim of wrongful retaliation. *Burdine*, 450 U.S. at 256; *Hicks*, 509 U.S. at 515. To prove the causal connection between the employee's protected activity and the adverse employment action, he must demonstrate that his "opposition to unlawful harassing conduct played a *motivating* part in the employer's decision to terminate the employee's employment." *Ruffin Hotel Corp. of Maryland, Inc. v. Gasper*, 418 Md. 594, 612 (2011) (emphasis in original).[6]

---

[6] A question arose before the hearing examiner and in the circuit court about whether the Supreme Court's holding in *University of Tx. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517 (2013) changed the standard of causation for retaliation claims under the Montgomery County Code from "motivating factor" causation to "but for" causation. *Nassar* adopted

The hearing examiner's opinion never stated in so many words that Mr. Belfiore successfully established a *prima facie* case for retaliation. But his discussion of the legal standard included that step, and his analysis reads to us to assume that Mr. Belfiore made his initial showing. And indeed, Merchant Link does not dispute that Mr. Belfiore established, at the very least, that he engaged in a "protected activity" (his October 21, 2011, email threatening legal action over his compensation), he suffered "adverse employment action" (he was fired on November 11, 2011), or that the close temporal proximity between his protected activity (three weeks) can support a presumption that the protected activity caused the firing. *See Edgewood*, 212 Md. App. at 205 (citing *Bleich v. Florence Crittenton Servs. of Baltimore, Inc.*, 98 Md. App. 123, 142 (1993)).

So too with Step 2. The hearing examiner never stated expressly that Merchant Link successfully met *its* burden to present evidence of a legitimate reason for Mr. Belfiore's firing, but we can see from his discussion of the legal standard and his analysis of Merchant Link's reasons that he considered them. As with the compensation claim, the bulk of the hearing examiner's retaliation analysis takes place here, where the presumption of retaliation has fallen away, and where Mr. Belfiore bore the burden of proving, from the

---

the latter standard and held that federal retaliation claims brought under Title VII must be proven by traditional principles of but-for causation. *Id.* at 2532–33. After requesting additional briefing and conducting a lengthy analysis, the hearing examiner determined that *Nassar* did not change the causation standard for retaliation claims under the Montgomery County Code. We need not decide which standard applies to Code violations, for two reasons: *first*, neither party briefed it, and *second*, any uncertainty was resolved in Mr. Belfiore's favor when the hearing examiner applied the less demanding "motivating factor" standard to his claims here.

totality of the evidence, that his protected activity was a "motivating factor" in his firing. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ("The ultimate question is whether the employer intentionally [retaliated], and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason…is correct.") (quoting *Hicks*, 509 U.S. at 524).

At Step 3, Mr. Belfiore argues *first* that the hearing examiner erred as a matter of law by finding that "[t]iming alone . . . is an insufficient basis for inferring an unlawful purpose behind an employment decision." In his brief, he appears to take the position that a period of fewer than three months between the protected activity and the adverse employment action establishes, by itself, the causation element of a retaliation claim. He relies on several cases, none of which holds that temporal proximity (three months or otherwise) suffices by itself to establish causation. *See, e.g.*, *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001) (holding that causation element was not established for retaliation claim); *Pascual v. Lowe's Home Ctrs., Inc.*, 193 Fed. Appx. 229 (4th Cir. 2006) (same); *Brockman v. Snow*, 217 Fed. Appx. 201 (4th Cir. 2007) (acknowledging that temporal proximity may establish causation for *prima facie* step of *McDonnell Douglas*; but holding that retaliation claim was not established because plaintiff failed to demonstrate defendant employer's reasons for adverse employment action were pretextual). Nor have we found any such case. *Cf. Williams v. Cerberonics, Inc.*, 871 F.2d 452 (4th Cir. 1989) (noting that temporal proximity can establish causation for purposes of making a *prima facie* case; but holding that plaintiff employee failed to establish retaliation because such

18

proximity and employer's knowledge of protected activity, alone, are not sufficient to establish retaliation); *Pulley v. KPMG Consulting, Inc.*, 348 F. Supp. 2d 388, 397 (D. Md. 2004) (plaintiff employee failed to establish retaliation claim where temporal proximity was the only evidence of causation). Temporal proximity is relevant, and the examiner considered it, but the examiner didn't err by declining to enter judgment purely on this basis.

*Second*, Mr. Belfiore argues that the hearing examiner erred in deciding that Merchant Link's proffered reasons for firing him were not pretextual. He points to several pieces of evidence or testimony,[7] all of which the examiner considered, and again seems to ask us to reweigh the evidence and draw different inferences. But again, that's not our role. As long as the hearing examiner's conclusions are supported by the record, which they are, and he made no errors of law, which he didn't, we must affirm his decision. *Banks*, 354 Md. at 68; *Baltimore Lutheran High School*, 302 Md. at 662–63 (citing *Bulluck*, 238 Md. at 512–13); *Kaydon Ring*, 149 Md. App. at 692. This claim was a closer call than his compensation claim, but we cannot say that the examiner was unreasonable in deciding that Mr. Belfiore's threat to invoke his legal rights was not a motivating factor in the firing.

The examiner was not wrong to require more than simply the temporal proximity between the protected activity and the firing. Although the examiner acknowledged that

---

[7] These are: (1) Mr. Belfiore's testimony that he was not against the new CRM system; (2) his testimony that he did not intimidate Ms. Dantzler; (3) his testimony that Mr. Minton's email embellished Ms. Dantzler's complaint about him; and (4) his contention that Merchant Link conducted no investigation of Ms. Dantzler's complaint about the meeting.

Mr. Lane had "acted precipitously" by firing Mr. Belfiore without first talking to him or seeking the perspectives of other employees, he ultimately found that the evidence weighed against a finding of retaliation. He found more credible Ms. Dantzler's account of her meeting with Mr. Belfiore and her testimony "that Mr. Belfiore asked to keep the conversation secret; that he used his purported assistance in getting her a promotion as leverage to help him; that he voiced his displeasure with the CRM system." And he noted that "[e]ven if Ms. Dantzler misperceived what he was asking her to do, Merchant Link, like Ms. Dantzler, could conclude Mr. Belfiore was acting against the company's interests" in particular because of the secrecy that Mr. Belfiore had asked of Ms. Dantzler.

The examiner also examined closely Mr. Lane's decision to take action on Ms. Dantzler's account of the meeting without talking to Belfiore or investigating further, and found it reasonable:

- He credited another employee's (Laura Kirby-Meck's) testimony about a phone call during which Mr. Belfiore "began to yell at her using profanity" and during which "she became so uncomfortable that she hung up."

- He noted the email from Mr. Minton, which Mr. Lane had seen, in which Mr. Minton had observed Mr. Belfiore "cussing and screaming" and using a "bullying, aggressive management style."

- He cited Mr. Lane's personal observations that when Mr. Belfiore returned from his medical leave, "his surliness became more intense," and that Mr. Belfiore was "[t]erse, confrontational, sometimes combative."

It's not correct to say, as Mr. Belfiore claims, that the hearing examiner's analysis was unreasonable or unsupported by the record. To the contrary, the examiner developed a detailed record over a six-day hearing. To be sure, the evidence was disputed, as were

the conclusions one might draw from it. But the examiner's conclusions fell within the range of conclusions a reasonable fact-finder could draw from this record as a whole.

*Finally*, Mr. Belfiore argues that the hearing examiner erred in failing to consider the "biased report" theory articulated in *Edgewood*, 212 Md. App. at 177 and *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011). In *Staub*, the Supreme Court held that "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable" for retaliation. 562 U.S. at 422 (applying USERRA). In *Edgewood*, this Court, citing *Staub*, held that a jury could reasonably have concluded that a supervisor's discriminatory report could still be the proximate cause of an adverse employment action, and thus supported a finding against the employer on a retaliation claim. 212 Md. App. at 205–06 (applying Montgomery County Code § 27-19). Mr. Belfiore appears to argue that an email from Ms. Dantzler's supervisor, Mr. Minton, about his meeting with Ms. Dantzler constituted a "biased report" and was the trigger that prompted Mr. Lane to terminate his employment. He contends as well that Mr. Lane and Ms. Nussbaum encouraged Mr. Minton to write the email, then used it as a basis to terminate him.

Ultimately, though, the *Staub*/*Edgewood* theory doesn't fit here. As an initial matter, Mr. Belfiore does not argue that Mr. *Minton* (the supervisor who wrote the alleged "biased report") had any racial animus toward him. Instead, he argues, or at least implies, that *Ms*. *Nussbaum* and *Mr*. *Lane* were motivated by racial animus in encouraging Mr. Minton to supplement Ms. Dantzler's report. But the hearing examiner made no such finding, and

21

indeed, Mr. Belfiore does not identify any evidence that could support one. In short, the

hearing examiner made no error in not considering the "biased report" theory because this

is not a fact pattern that fits into that theory.

                                           **JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**